TYYNE KARJAVAINEN *vs.* LESLIE BUSWELL.

Essex.   November 7, 1934. — February 8, 1935.

Present: Rugg, C.J., Crosby, Pierce, Donahue, & Lummus, JJ.

*False Imprisonment. Insane Person. Conspiracy. Statute,* Construction. *Evidence,* Relevancy; Opinion: expert. *Practice, Civil,* Charge to jury, Exceptions.

A statute which purports to authorize a person or an officer of government to restrain, for any length of time, a person in the exercise of his personal liberty is to be strictly construed. Per Pierce, J.

It *was stated* that G. L. (Ter. Ed.) c. 123, § 79, requires by necessary implication that a physician, and also each of the persons or officers named therein, shall act in good faith and without negligence whenever he exercises the power conferred on him thereby.

A combination between a physician and another to commit a sane person to an insane asylum is not only a criminal conspiracy, punishable in

the manner provided in G. L. (Ter. Ed.) c. 123, § 110, but is also a civil conspiracy which gives a right of action for damages to the person so committed.

A sane woman, who, upon request of a physician acting in good faith under G. L. (Ter. Ed.) c. 123, § 79, but induced so to act by false statements made to him by the woman's employer, was committed to a State hospital for observation, could maintain an action for false imprisonment against the employer; the good faith of the physician was no defence to such action.

An instruction to the jury at the trial of such action, that the commitment would be justified if the plaintiff was "a person needing immediate care and treatment because of her mental derangement regardless of the motive of any one, regardless of malice, regardless of good faith or bad faith, regardless of the question whether the defendant caused it to be done or participated in it," was sufficient, and the defendant was not entitled to have added, at his request, "that if the plaintiff was in need of hospital care and the doctor so considered that she was, the communication of false information . . . or the malice of the defendant, would be in no way material."

A charge to a jury is to be considered as a whole to determine whether it is legally correct, and is not to be tested by fragments which may be open to just criticism.

At the trial above described, evidence, as to certain relations between the plaintiff, who was a domestic servant of the defendant, and one residing at the defendant's house as a guest during a period previous to the plaintiff's commitment, was relevant and admissible both on the issue of the defendant's motive and the issue of the plaintiff's sanity.

A general exception to the admission of evidence must be overruled if the evidence was admissible for any purpose.

At such trial, testimony of an attorney, that after the commitment of the plaintiff he took a doctor, who specialized in mental diseases and who was dead at the time of the trial, to the State hospital to visit the plaintiff and that thereafter the plaintiff was released from the hospital, was admissible, not as an expression of the witness's opinion of the learning or skill of the doctor, but as a declaration of the fact that the doctor specialized in mental diseases.

TORT. Writ dated July 23, 1930.

In the Superior Court, the action was tried before *Goldberg*, J. Material evidence and rulings by the judge are described in the opinion. There was a verdict for the plaintiff in the sum of $14,750. An order by the judge for a remittitur and a report of the action for determination by this court are described in the opinion.

*W. E. Sisk*, for the defendant.

*J. M. Graham*, (*A. A. Gauthier* with him,) for the plaintiff.

PIERCE, J.  This is an action of tort in which the plaintiff claims damages for assault and false imprisonment. The plaintiff alleges specifically that the defendant, through his servants and agents, caused an assault to be made upon her and caused her to be imprisoned and restrained of her liberty in the Danvers State Hospital. The case was tried to a jury and a verdict was returned for the plaintiff in the sum of $14,750. The defendant filed a motion for a new trial upon various grounds, one being that the damages were excessive. The court entered an "Order for Remittitur" allowing the defendant's motion for a new trial, unless the plaintiff should remit all but $5,000 of the amount of the verdict, and a memorandum was filed that the new trial should be confined to the question of damages. The plaintiff did not file the remittitur within the ten days ordered by the court.

At the close of the evidence received at the original trial, the judge expressed the opinion that the issues raised by the defendant's exceptions should be determined by the full court before any further proceedings in the trial court, and, by agreement of the parties, reported the case for determination of the questions of law saved, with the provision that "If the record discloses error prejudicial to the defendant, such disposition is to be made as the Supreme Judicial Court may conclude proper; if there is no such error, the case is to be remanded to the Superior Court for trial upon the question of damages only."

The first assignment of error is the denial of a motion for a directed verdict for the defendant. We consider the evidence most favorable to the plaintiff, and all inferences in her favor which are warranted by the evidence are to be made. *Shea* v. *American Hide & Leather Co.* 221 Mass. 282, 283. The evidence warranted the finding of the following facts: For one or two years before 1928, the plaintiff was employed as a maid servant by the defendant. Her services were satisfactory and the defendant was without suspicion of her mentality. The defendant married in September, 1928, and with his wife went away for three months. During most of this period a guest, one

Naegele, resided at the defendant's place, Stillington Hall, Gloucester, Massachusetts. The plaintiff was the only person left as help in the house during this time. Naegele and the plaintiff became very friendly; she got his meals, waited on him and kept the house in order for him, and did whatever he chose to have her do.

In the fall of 1929 the defendant went to New York for four or five weeks, returning to Stillington Hall a couple of days before Thanksgiving. Without permission the plaintiff went to New York during the absence of the defendant to see Naegele and carried him flowers. She returned before the defendant. On hearing of this visit the defendant became angry and said to his wife that they must get rid of the plaintiff, that if she did not he would, and that it was impossible to let a girl like her marry a man like Naegele. He also ordered the plaintiff to leave Naegele alone. This was in November, 1929. The defendant and his wife left Gloucester on December 16, 1929, he going to New York, and she to Pittsburgh. On December 21, 1929, he returned to Gloucester. A butler and his wife had been employed at Stillington Hall from September, 1929. On December 22, 1929, at about 11 A.M. the defendant sent for his butler and they discussed the condition of the plaintiff. The defendant then called Dr. Johnson, who had been his physician since the defendant had lived in Gloucester, and had the butler tell him what he knew about the plaintiff. The statements of the butler to the defendant concerning the plaintiff, which were repeated to the doctor, are set out in the record, and, if believed, would indicate to a nonexpert physician or any ordinary person that the plaintiff was mentally unbalanced. Dr. Johnson made no personal examination of the plaintiff and did not attempt any, nor did he attempt to verify in any way what he had been told. Dr. Johnson recommended that the defendant bring the butler over to the Beverly Hospital to see Dr. Randall, a specialist in mental diseases, where that specialist could get the history of the case from the butler. During this talk the butler came back into the room and told the defendant in the

presence of Dr. Johnson things respecting the alleged abnormal conduct of the plaintiff. On the next day, December 23, 1929, the defendant and the butler went to the Beverly Hospital and there met Dr. Randall. Dr. Randall, Dr. Johnson and the defendant had some talk about the condition of the plaintiff as the defendant had observed it the previous morning. Dr. Randall told the defendant to return home and that he would come over immediately. The defendant and the butler returned to Stillington Hall and Dr. Randall arrived there a few minutes later. After a talk with the butler, but before he saw the plaintiff and before he verified any statements of the butler, Dr. Randall gave the defendant a paper and said, "someone must go down to the police station to get a policeman and a matron." The defendant expressed willingness to go, took the paper to the police station and brought back a plain clothes man and a police matron in his car. The plaintiff was in her room when Dr. Randall came; the butler knocked on her door and said there was mail for her. After waiting until she thought he had gone she unlocked the door. Four people pushed the door open so hard that they rushed right to the back of the room. Meanwhile the plaintiff ran out and upstairs to the bathroom and locked the door. The butler took the hinges off and pulled the plaintiff downstairs. The plaintiff asked permission to telephone to her uncle who lived in town and the request was refused. She was then taken in the defendant's automobile to the Danvers State Hospital and put in the "violent" ward. Dr. Randall sent along a request for temporary care under G. L. (Ter. Ed.) c. 123, § 79. On application of Dr. Randall on December 30, 1929, the plaintiff was committed for observation under G. L. (Ter. Ed.) c. 123, § 77, by the judge of the First District Court of Essex. The order of commitment certified that the judge had not seen or examined the plaintiff because he did not deem it necessary. On January 24, 1930, a specialist in mental diseases went to the hospital to examine the plaintiff at the request of her attorney and she was discharged on January 26, 1930, "condition unimproved,"

which meant that her condition was the same as when admitted. The plaintiff has never been back to any hospital for mental diseases or had other medical treatment since her discharge.

All the facts which indicated that the plaintiff was mentally unbalanced came from the defendant or the defendant's witnesses. The defendant stated for the hospital record that he did not think it wise for the plaintiff to live in Gloucester. He testified that about December 16, 1929, he had made up his mind that the plaintiff should go away for a period, but before December 22 had not made up his mind that she ought to go to a hospital. The wife of the butler testified on cross-examination that the defendant was paying her and her husband $100 and all expenses for their time and trouble in coming to court. Dr. Randall rendered a bill for his services and the defendant paid it. As above stated neither Dr. Johnson nor Dr. Randall ever tried seriously to verify any statement made by the defendant or the butler. The plaintiff denied all the stories told by the butler and others which tended to show that she was unsound mentally. Dr. Randall testified that the plaintiff "probably could get along in the community if some responsible person could supervise her," but he "made no effort to ascertain whether there was some responsible person to supervise her," and thought she should be kept in the insane asylum and under observation. After the commitment the defendant joined his wife at Pittsburgh, and about New Year's day they and Naegele returned to Gloucester.

The plaintiff in her brief states, in substance, that the alleged false imprisonment charged in count one of her declaration is based on her commitment to the State Hospital for the Insane at Danvers, without any judicial action authorized by statute and without justifiable cause; and that the case was tried on the theory that the defendant made certain representations and conspired with others, especially his butler, to make representations to Dr. Johnson and to Dr. Randall, which would naturally and did in fact cause her commitment. At the trial or argument the

plaintiff did not admit that the doctors acted in good faith.

The parties in their briefs have argued the motion for a directed verdict for the defendant and the requests for rulings and instructions together, and we shall follow that course so far as may properly be done. Fundamentally it is the contention of the plaintiff that the evidence in its aspect most favorable to her action warranted the jury in finding that the defendant conceived the idea of putting her in an insane asylum and directed the course of events, which resulted as he had intended, to such an extent that he could be said to have caused or participated in the imprisonment. The defendant admits he had no power to send the plaintiff to the Danvers State Hospital, but contends that the causal connection between his purpose and the actual incarceration of the plaintiff in the asylum was broken when Dr. Randall under the authority of G. L. (Ter. Ed.) c. 123, § 79, executed the temporary care paper, printed in the record, and the plaintiff was received by the superintendent of the State hospital. Pursuing this argument the defendant says that he is not liable in the form of action chosen by the plaintiff even if Dr. Randall signed the "request" upon false information given him by the defendant and the butler for the purpose of causing the doctor to send the plaintiff to the Danvers State Hospital, and contends that the remedy of the plaintiff in such a situation is not an action for false imprisonment but one for malicious prosecution or slander. G. L. (Ter. Ed.) c. 123, § 79, provides that the "superintendent or manager of any institution for the insane . . . may, when requested by a physician . . . [or other named persons] receive and care for in such institution as a patient, for a period not exceeding ten days, any person needing immediate care and treatment because of mental derangement other than delirium tremens or drunkenness. Such request for admission of a patient shall be put in writing and be filed at the institution at the time of his reception, or within twenty-four hours thereafter, together with a statement in a form prescribed or approved by the department, giving such infor-

mation as it deems appropriate." By necessary implication the superintendent and manager who receive patients for examination under the statute are protected by the statute against an action for false imprisonment. No statute of this Commonwealth in terms gives protection against an action for false imprisonment to a physician or any of the persons or officers named in said § 79, who takes in custody a person who in his opinion stands in need of "immediate care and treatment because of mental derangement other than delirium tremens or drunkenness," and delivers such person to a superintendent or manager of an institution for the insane for care in such institution. It is plain that any statute is to be strictly construed which purports to authorize a person or an officer of government to restrain for any length of time a person in the exercise of his personal liberty. So construed, § 79 requires by necessary implication that a physician, as also every one of the persons or officers named in § 79, shall act in good faith and without negligence whenever, acting under said section, they exercise the power conferred on them by that statute. Section 79 provides with particularity how such commitment shall be made, and plainly indicates that no physician, nor any person or officer named in said statute, should arrest and send to an insane asylum for examination and care a person who is merely insane, but not needing immediate treatment, and not dangerously insane or disturbing the peace. *Look* v. *Choate*, 108 Mass. 121, 123.

This theory of the legislative intention in enacting G. L. (Ter. Ed.) c. 123, § 79, is emphasized by the provision of G. L. (Ter. Ed.) c. 123, § 110, which provides that a "physician who wilfully conspires with a person unlawfully or improperly to commit to an institution for the insane a person who is not insane shall be punished by fine or imprisonment, at the discretion of the court." This provision makes clear that a combination between a physician and another to commit a sane person to an insane asylum is not only a criminal conspiracy, punishable in the manner provided, but is also a civil conspiracy which gives a right of action for damages to a person whose rights are injured.

If we assume that Dr. Randall acted in good faith and was not guilty of any unlawful or improper agreement with the defendant to put the plaintiff in an institution for the insane, but that the jury found on the evidence that the defendant, in collusion with his butler, caused Dr. Randall by false statements as to the facts to request the commitment of the plaintiff to the Danvers State Hospital, and that she was in consequence received and detained there, the defendant would be liable to the plaintiff in damages for false imprisonment. It would be no defence to the action, if the plaintiff was in fact sane, that the doctor acted in good faith and might have made the application and procured the committal on his own initiative, if, in fact, he was induced to act and did act because of false statements of the defendant and of his butler.

The contention of the defendant that the doctor was immune under the statute from liability to the plaintiff may be admitted without leading to the legal conclusion that the defendant is also protected from civil liability to the plaintiff, because his wrong to the plaintiff preceded the acts of the doctor, if the acts of the defendant were the force that moved the doctor and induced his acts, which in turn resulted in the imprisonment of the plaintiff. See *Gibbs* v. *Ames*, 119 Mass. 60, 66; *Look* v. *Dean*, 108 Mass. 116; and *Fletcher* v. *Fletcher*, 28 L. J. Q. B. 134, 136, which holds that a statute expressly protecting physicians acting in good faith affords no protection from the common law rule that a person is arrested at the risk of the arrester if it appears that in fact the victim was not dangerously insane, even though the certificates have been procured from physicians before the arrest. *Hall* v. *Semple*, 3 F. & F. 337, 350. There was evidence to warrant the jury in finding that the defendant either directed Dr. Randall to send the plaintiff to the Danvers State Hospital or that Dr. Randall did send the plaintiff to that hospital because the defendant persuaded or induced him so to do, and inferentially there was evidence, although very slight, which warranted a finding that there was an understanding or agreement between the doctor and the defendant to that

end.   This being the case, the requests of the defendant for certain rulings, numbered 1, 2, 3, 14, 15, 17, 18, 22 and 23, were denied rightly, as was the motion for a directed verdict for the defendant.

The defendant excepted to the part of the charge wherein, as stated by counsel for the defendant, the judge said: "Supposing the defendant told the doctor, directed the doctor to take the plaintiff to the hospital and then the doctor would be an agent of the defendant"; and also to the part of the charge wherein, as stated by counsel for the defendant, the judge said: "If the defendant knowingly gave false information to the doctor with intent to have her committed to the hospital."   At the time the exception was taken the defendant suggested that the judge add: "that if the defendant [plaintiff] was in need of hospital care and the doctor so considered that she was, the communication of false information . . . or the malice of the defendant, would be in no way material."   In answer the judge said: "I specifically said so when I discussed justification.   I said the motive would be of no consequence if she in fact was."   Turning to the charge itself it appears that the judge said that the commitment would be justified if the plaintiff was "a person needing immediate care and treatment because of her mental derangement regardless of the motive of any one, regardless of malice, regardless of good faith or bad faith, regardless of the question whether the defendant caused it to be done or participated in it."   It is plain that the addition to the charge requested by the defendant was fully covered by the portion of the charge above quoted.

The defendant excepted to the part of the charge wherein the judge said: "if you should find that the defendant knew that the butler's story was false and . . . directed the butler . . . to . . . see Dr. Randall and tell the doctor this story which he knew was false" and that the defendant as a reasonable man should know "that such a false story would cause the doctor to send her away."   Counsel for the defendant stated "the exception is to the fact because we don't believe there was any evidence warranting

the jury in so finding." The defendant excepted to the part
of the charge wherein, as stated by counsel for the defend-
ant, the judge said: "If the defendant went to the station
for the police at the request of the doctor and left a note
there, that wouldn't be a participation, but . . . if he went
to the Gloucester police station for the purpose of getting
the police to take her [the plaintiff] out of the house and
take her to the hospital, that would be a participation."
The statements of the defendant in no instance were quite
the language of the judge, but stated the substance in each
instance correctly. A consideration of the whole charge,
as distinguished from fragments of it, shows that the in-
structions given as bearing on the agency for the defendant
of the doctor or of the chauffeur or of the butler contained
no reversible error, and an examination of the record dis-
closes a sufficiency of evidence to justify the charge as given.
The charge clearly relieved all persons from liability, if the
jury should find that the plaintiff did actually need imme-
diate care and treatment because of her mental derange-
ment. It is settled that the charge is to be considered as a
whole to determine whether it is legally correct, rather than
tested by fragments which may be open to just criticism.
*Gilchrist* v. *Boston Elevated Railway*, 272 Mass. 346, 353.

There is no merit in the exceptions to the admission of
evidence. The case was tried in part on the theory of a
conspiracy to imprison the plaintiff falsely. The exception
of the defendant to the testimony of the plaintiff as to her
relations with Naegele, at Stillington Hall, in the fall of
1928, was based upon the theory that such relationship
was immaterial upon the issue of the insanity of the plain-
tiff and would not have warranted a jury in finding that
the defendant had anything to do with the sending of the
plaintiff to the Danvers State Hospital, and also that there
was not the slightest evidence that the defendant was ever
in a conspiracy with Dr. Randall to send the plaintiff to
the Danvers State Hospital. The alleged conspiracy could
have been proved either by direct or circumstantial evi-
dence and this is the usual way of proving a conspiracy.
*Commonwealth* v. *Smith*, 163 Mass. 411. The evidence that

the defendant had a motive in seeking to get rid of the plaintiff through imprisonment in the Danvers State Hospital was competent, and the testimony of the plaintiff showed on what the purpose of the defendant rested. The evidence was also admissible on the question of the plaintiff's sanity. The objection to the admission of the plaintiff's testimony was a general objection and within the rule that there is no reversible error if the evidence was admissible for any purpose. *Stitt* v. *Tribe,* 270 Mass. 204, 206. As it turned out later in the trial the evidence was relevant. The objection to its admission became an objection to the order of proof, if it should not have been received when offered. *Commonwealth* v. *Corcoran,* 252 Mass. 465, 488. *Commonwealth* v. *Knight,* 257 Mass. 421, 425, 426. The testimony of an attorney that in January, 1930, he took a doctor who specialized in mental diseases, and who was dead at the time of the trial, to the Danvers State Hospital to visit the plaintiff, and that thereafter the plaintiff was released from the hospital, was admissible not as an expression of the witness's opinion of the learning or skill of the doctor, but as a declaration of a fact, to wit, that the doctor specialized in mental diseases.

The requests, in the main directed to the support of the defendant's motion for a directed verdict, particularly to the contention that the evidence did not warrant a finding of conspiracy between Dr. Randall and the defendant, have all been considered generally, and the refusal to give them specifically was proper.

Upon consideration of all the evidence, the exceptions to the admission of evidence and to the charge, we find no reversible error. It follows that the exceptions are overruled and the case is to stand for further hearing on the issue of damages only.

*So ordered.*