JOHN W. NASON *vs.* SUPERINTENDENT OF BRIDGEWATER STATE HOSPITAL.

Suffolk. January 2, 1968. — February 5, 1968.

Present: WILKINS, C.J., SPALDING, CUTTER, KIRK, & REARDON, JJ.

*Mentally Ill Person. State Hospital. Constitutional Law*, Equal protection of laws, Due process of law, Mentally ill person.

Comparison of the staff and facilities at Bridgewater State Hospital, supervised by the Department of Correction, with the staff and facilities at other State mental hospitals, supervised by the Department of Mental Health, in 1967. [608–610]

Confinement of persons in public institutions for their own and the public's protection, without having available to them adequate medical and psychiatric treatment on a reasonable, nondiscriminatory basis, risks raising questions as to equal protection of the laws, and confinement of mentally ill persons, not found guilty of any crime, without affording them reasonable medical and psychiatric treatment, risks raising questions of deprivation of liberty without due process of law. [611–612]

With respect to a petitioner for a writ of habeas corpus who had been committed to the Bridgewater State Hospital under G. L. c. 123, § 100, and there determined to be "not competent to stand trial" for a murder for which he had been indicted, and to be "in need of further hospitalization," and who was "suffering from a schizophrenic reaction, chronic . . . type with prominent paranoid features" and was a danger to himself and to others, and as to whom "prognosis as to his complete recovery must remain guarded," but whose condition, if "given adequate treatment," should improve, where it appeared that efforts were being made to improve the staff and facilities at the hospital to correct its serious deficiencies as a mental hospital so that the petitioner would receive proper therapy, it was held that a program for the petitioner's appropriate treatment should be determined by competent doctors and followed diligently within a reasonable time, and that the trial court should retain jurisdiction of the proceeding. [613–614]

PETITION for a writ of habeas corpus filed in the Supreme Judicial Court for the county of Suffolk on January 25, 1967.

The case was reserved and reported without decision by *Cutter, J.*

*William P. Homans, Jr.,* for the petitioner.

*Willie J. Davis,* Assistant Attorney General, for the respondent.

CUTTER, J. In *Nason* v. *Commissioner of Mental Health,*
351 Mass. 94, 98, this court held that the commissioner
could not be compelled by mandamus to make available
proper psychiatric treatment to Nason, a patient at Bridge-
water State Hospital (Bridgewater). Cases were cited,
however, where "the legality . . . of . . . confinement"
had been tested either by habeas corpus or by comparable
statutory relief.

Nason now seeks a writ of habeas corpus. His petition
contains allegations (confirmed by findings of the special
commissioner mentioned below) that he is in custody at
Bridgewater in the following circumstances. He was in-
dicted for the murder of his wife on September 12, 1962.[1] On
August 24, 1962, pursuant to G. L. c. 123, § 100 (as amended
through St. 1956, c. 589, § 7), he was committed to Bridge-
water for observation. On October 16, 1962, the medical
director of Bridgewater concluded that Nason was competent
to stand trial. He was returned to the county jail. While
confined there, Nason became actively psychotic. He again
was sent to Bridgewater on March 15, 1963. There he
was determined to be "not competent to stand trial" and
"in need of further hospitalization." Pursuant to G. L.
c. 123, § 105 (as amended through St. 1961, c. 101, § 2; see
later amendment by St. 1965, c. 80), he was committed
on May 23, 1963, to Medfield State Hospital (Medfield).
Later the commitment to Medfield was revoked and on
June 4, 1963, he was committed to Bridgewater. He is
not under sentence for any crime. The principal ground of
relief alleged[2] is that "Bridgewater . . . is so understaffed
. . . as not to be able to furnish its patients, including . . .

---

[1] After a considerable period of strange behavior by Nason, during which
he had injured his five months' old child and destroyed his wife's new auto-
mobile, Mrs. Nason's body with multiple stab wounds was found floating in
a creek. Nason's prior criminal record involved only minor offences.

[2] The petition also makes allegations, not now pressed, which may pre-
sent the question whether Nason was transferred on June 4, 1963, from Med-
field to Bridgewater after adequate notice and proper hearing. The special
commissioner made no findings on this issue adequate to establish any im-
propriety in this transfer. Accordingly we need not now discuss the transfer.
Nason does not argue that his present condition requires or permits his re-
lease or that he should not be confined in some State hospital.

[Nason] the treatment required so that they may have the opportunity to recover from the . . . mental illnesses from which they suffer; that Bridgewater . . . does not have the same medical . . . facilities . . . [as] all other state hospitals under the jurisdiction of the Department of Mental Health"; that the "staff-patient ratio at Bridgewater . . . falls markedly below the standard of all other state hospitals . . . and that . . . [Nason] is unable to receive any treatment for . . . [his] illness." Nason further avers that, because at Bridgewater the medical standards "are substantially less than the standards of other [S]tate hospitals . . . [he] is deprived of the equal protection of the laws," and that his confinement (while not under sentence for crime) without treatment denies him due process of law.

On February 15, 1967, with the consent of the parties, a single justice referred the case to a special commissioner, who was to have the powers of an auditor whose findings were to be final. The special commissioner on July 21, 1967, filed a comprehensive, thorough report, summarized below. Because, after the report was filed, there were changes (a) in the medical staff and the general treatment methods and facilities at Bridgewater and (b) in Nason's treatment, the parties stipulated certain additional facts. A single justice reserved the case, without decision, upon the pleadings, the special commissioner's report, and the stipulation.

1. We first consider the special commissioner's findings. Where the findings have been supplemented by stipulation, this is indicated below.

### NASON'S CONDITION AND PAST HOSPITAL TREATMENT.

Nason is "suffering from a schizophrenic reaction, chronic . . . type with prominent paranoid features," is not able to stand trial, and constitutes a danger to himself and to others. Any "prognosis as to his complete recovery must remain guarded." If he were to be "given adequate treatment, his condition could most certainly be expected to

improve," perhaps "sufficiently to become competent to stand trial."[3]

Nason, while confined in mental institutions, has been constantly at Bridgewater, except for his short stay (May 23 to June 3, 1963) at Medfield.[4]  At Bridgewater he has been kept in one or other of two wards, Ward E, the maximum security ward, and Ward F, the intensive care ward, which consists of individual seclusion rooms facing a central passageway.[5]  He appears to have received no medication or medical treatment, while in Ward E, prior to June 4, 1963. When in Ward F, he received only the routine treatment given to patients in that ward (see fn. 5).  As he became increasingly paranoid, he refused medication and none was given to him.  His treatment was "custodial care; three meals a day and a bed."  He received no individual or group therapy.

In April, 1964, two psychiatrists from the Boston University Law-Medicine Institute, "engaged in a program of limited intensive care and study" at Bridgewater.  They diagnosed Nason as "a passive aggressive personality, aggressive type."  He then showed no active psychosis. A medical program, "designed to improve . . . [Nason's] condition" so that he could stand trial, was not fully pursued because the staff was not adequate.

When his condition seemed to improve, his trial was scheduled for January 12, 1965.  Acute regression occurred, and Nason remained at Bridgewater.

---

[3] A report (before us by stipulation) of the acting medical director at Bridgewater, dated August 29, 1967, supports the special commissioner's conclusion about Nason's condition.  "[H]is complete recovery . . . is not probable in the near future. . . . [H]e remains potentially dangerous and certainly" needs maximum security.  "The diagnosis remains as" before with "quite guarded prognosis."

[4] Medfield's superintendent thought Nason required physical security which Medfield could not provide.  He requested Nason's transfer to Bridgewater where, upon his return, his condition was found to have improved.

[5] In Ward E there are about twenty patients, free during the day to move about the locked, guarded ward and a recreation room.  Patients in Ward F (depending on their condition) are locked in their rooms during the day or are allowed in the passageway under the supervision of guards.  Patients with suicidal tendencies may be locked in their rooms without furniture, bedding, or clothing.  Ordinarily each "room is furnished with a cot, a table and a toilet pot."  As a matter of routine, a tranquilizing drug and an anti-depressant drug are administered to patients in Ward F.  A physician walks "through Ward F two or three times a week to check on the patients."

After January, 1965, Nason refused medication, and, consequently, as before, received substantially no medical treatment, no medication, and no individual or group therapy. In his present condition therapy would be substantially valueless in the absence of medication, forcibly administered if necessary. Late in 1966, Nason was transferred from Ward F to Ward E.

The parties have stipulated that Nason now is "seen daily," at least for observation, by the doctor in charge of the intensive treatment ward. He is allowed freedom within Ward E to work during the day. He is being given drug therapy. His progress, if any, is slow.

Proper treatment of Nason would involve the following: (a) tranquilizing and anti-depressant drugs to calm him sufficiently to lead him to accept "verbal therapy"; (b) intensive psychiatric verbal therapy, for an hour a day, two or three times a week; and (c) after stabilization of his condition, use of a less intensive drug dosage. If Nason's condition can be stabilized, verbal and group therapy will become more valuable. Whether electric shock treatment would help is a subject of medical dispute. With the treatment outlined above, Nason "could be expected to show marked improvement in a relatively short time." Drug treatment "without psychotherapy will merely control the symptoms without . . . achieving any remission of the sickness."

### COMPARISON OF BRIDGEWATER WITH OTHER STATE HOSPITALS.

Bridgewater, supervised by the Department of Correction, is one of twelve public mental institutions in the Commonwealth. The others are supervised by the Department of Mental Health. Bridgewater has uniformed guards and "a higher degree of confinement security." The other institutions have lesser security and only a few "locked wards and seclusion rooms." Bridgewater (with a population of 600 persons under indefinite commitment and of about

thirty patients under observation) is designed for inmates deemed to constitute a danger to themselves or to others if confined outside of a maximum security setting. "[E]xcept for . . . uniformed guards, locked wards, and . . . seclusion rooms," Bridgewater offers little. The plant is "run-down and antiquated" although it is kept "remarkably clean." Bridgewater's "basic inadequacy" is "a serious lack of adequate professional staffing."[6] From 1957 to 1966, the patients annually admitted for observation (G. L. c. 123, § 100) have risen from 137 to 454. Because the staff spends most of its time on these patients, little time is left for the others. It "would be impossible" for the staff existing at the time of the special commissioner's report (especially in view of the administrative demands upon the acting medical director, the best qualified doctor there) to treat the 600 patients at Bridgewater. The staffing situation was "desperate." The "limited" program of Boston University Law-Medicine Institute was a part-time "pilot project" which dealt with only about fifteen patients in a special ward at a time. It was the "only program of con-

---

[6] A. At the time of the special commissioner's report the medical staff consisted of the following persons: (a) The acting director (not a diplomate in psychiatry as are the superintendents of the other eleven public mental institutions) who has had twelve years of practical psychiatry. (b) A doctor, since replaced, with temporary license but no experience in psychiatry. (c) A doctor, foreign born and educated, who has language difficulty and cannot give verbal psychotherapy. (d) One newly qualified neurologist at Bridgewater only a year. (e) Two registered nurses, two licensed practical nurses (plus four hired in 1967), and four social workers.

B. It was stipulated (but without agreement whether the positions were permanent or supported by continuing appropriations) that, after the special commissioner's report, the professional personnel listed below have been added: (a) one director of nurses, three supervisors, eight head nurses, fourteen licensed practical nurses, two male licensed practical nurses for the intensive treatment ward; (b) three recreational officers, one occupational therapist, two assistant psychologists, and five social workers; (c) one doctor (three years of experience at Grafton State Hospital) replacing the second doctor mentioned in par. A; (d) one doctor (primarily medical and surgical), one doctor with qualifications not stated, and Dr. Harry Darling (fifteen years of psychiatric experience, including two years in charge of the criminal division at Montana State Hospital), and (e) two consultant rehabilitation psychiatrists. Two more such consultants were to be added in September, 1967.

sistent treatment for any of the indefinitely committed patients."[7]

By contrast, each of the other public mental hospitals is annually inspected by the Department of Mental Health, and its staff and facilities meet Massachusetts licensing requirements (see fn. 7). Each of the eleven hospitals would be better than Bridgewater for treating Nason and would be adequate and suitable to do so. Each other hospital, however, has been "moving towards an open-door policy and away from . . . locked wards and seclusion rooms" in an effort "to encourage patients to [make] progress towards out-patient status." If a patient appears dangerous to others, the policy is to transfer him to Bridgewater. The other eleven hospitals are much more generously staffed than Bridgewater.[8]

## PROPRIETY OF A TRANSFER OF NASON.

Nason is dangerous and requires a higher degree of security than is normally available at the other institutions. Without adequate treatment his now chronic condition will not improve. Chances of Nason's recovery are about one in four. Except for security considerations there is no reason for keeping "Nason, or anyone else," at Bridgewater.

None of the institutions, in the matter of treatment, distinguishes among patients on the basis of whether they have been (a) convicted of crime, (b) charged but not convicted, or (c) placed in custody but not charged. It is the practice

---

[7] Various Bridgewater procedures were inconsistent with good practice. There was no annual physical examination of each patient or regular program for evaluating patients. The medical staff was not competent to administer electric shock treatment. Drugs were not distributed under proper supervision nor administered involuntarily where patients refused medication. The institution would not satisfy the accreditation requirements of the American Psychiatric Hospital Association or the Commonwealth's hospital licensing requirements.

[8] Boston State Hospital, for example, with 1,500 in-patients and about 600 out-patients has eighty physicians on its full-time medical staff (including twenty-five qualified psychiatrists), plus about eighty registered nurses, 520 practical nurses, twenty-eight professional social workers and miscellaneous professional social workers, therapists, and others. About 800 patients "are receiving active consistent treatment" with good drug treatment and group and individual verbal, occupational, and recreational therapy.

to transfer to Bridgewater prisoners under sentence who become mentally ill. The governing factor, in determining to transfer a patient to Bridgewater, seems to be whether the court finds a need for maximum security.

## RECENT CHANGES AT BRIDGEWATER.

In addition to the recent additions to staff (see fn. 6, par. B), it is stipulated that there have been the following changes at Bridgewater since the special commissioner's report. (a) Some increased recreational and work activities, which may have therapeutic value, have been added. (b) Some patients have been transferred to other hospitals. (c) Handling of drugs has been improved.

No objections or exceptions were filed to the special commissioner's report. It is conceded that Bridgewater affords less adequate treatment than other State hospitals and we conclude that its staff and facilities still require substantial improvement before they will be able to provide fully suitable treatment for patients like Nason.

2. Because he has not been convicted of any criminal offence, Nason's commitment for mental illness (see *Robinson* v. *California,* 370 U. S. 660, 666–668) cannot be justified as penalty for crime (see *Commonwealth* v. *Dagle,* 345 Mass. 539, 542), but only as nonpenal confinement for his protection and treatment and for the protection of the public. So far as is reasonably possible, it should not be penal in its practical effect. See *Commonwealth* v. *Page,* 339 Mass. 313, 316–318; *Commonwealth* v. *Hogan,* 341 Mass. 372, 376.

Cases like this present serious constitutional, legislative, and budgetary problems.[9] In comparable matters we have not failed to consider whether adequate medical and psychiatric treatment is available to persons confined in public

---

[9] See e.g., Birnbaum, The Right to Treatment, 46 Am. Bar Assn. J. 499; Bassiouni, The Right of the Mentally Ill to Cure and Treatment; 15 De Paul L. Rev. 291; Kittrie, Compulsory Mental Treatment and the Requirements of "Due Process," 21 Ohio St. L. J. 28; note, 79 Harv. L. Rev. 1288. See also note (Civil Restraint, Mental Illness, and the Right to Treatment), 77 Yale L. J. 87, containing a comprehensive discussion of this whole field of the law.

institutions for their own and the public's protection. See the *Page* case, 339 Mass. 313, 317–318, and the *Hogan* case, 341 Mass. 372, 376–377. If such treatment is not available on a reasonable, nondiscriminatory basis, there is substantial risk that constitutional requirements of equal protection of the laws will not be satisfied. Differences in treatment may be justified by differences in particular cases but should be reasonably related to the varying circumstances. *Baxstrom* v. *Herold*, 383 U. S. 107, 110–115. See *Rouse* v. *Cameron*, 373 F. 2d 451, 454–455 (Ct. App. D. C.); *People* v. *Lally*, 19 N. Y. 2d 27, 32–35. See also *Specht* v. *Patterson*, 386 U. S. 605, 608. Confinement of mentally ill persons, not found guilty of crime, without affording them reasonable treatment also raises serious questions of deprivation of liberty without due process of law. As we said in the *Page* case, 339 Mass. 313, 317, of a statute permitting comparable confinement, "to be sustained as a nonpenal statute . . . it is necessary that the remedial aspect of confinement . . . have foundation in fact." See *Darnell* v. *Cameron*, 348 F. 2d 64, 67–68 (Ct. App. D. C.); *Tribby* v. *Cameron*, 379 F. 2d 104, 105 (Ct. App. D. C.). See also *Miller* v. *Overholser*, 206 F. 2d 415, 418–419 (Ct. App. D. C.); note 77 Yale L. J. 87, 97–104. Cf. *Sas* v. *Maryland*, 334 F. 2d 506, 516–517.

We perceive no denial to Nason of any constitutional right merely because of his confinement in a maximum security institution, if he is there afforded adequate treatment. He is charged with a crime of violence and is dangerous. Persons like Nason may be given, and may require, a different type of treatment and confinement from that afforded to less seriously deranged persons. *In re Cathey*, 55 Cal. 2d 679, 694. The Commonwealth need not provide maximum security facilities at other State hospitals under the jurisdiction of the Department of Mental Health. Instead, even for persons not serving sentences for crime, such facilities, if adequate, may be provided in a hospital under the control of the Department of Correction. Proper treatment and facilities for dangerous patients, however,

must be provided somewhere if such care is not available at the Commonwealth's only maximum security mental institution. See *In re Cathey*, 55 Cal. 2d 679, 693. See also *Rouse* v. *Cameron*, 373 F. 2d 451, 457–458 (Ct. App. D. C.). If facilities and treatment adequate and appropriate in the light of Nason's condition and prognosis are not provided at Bridgewater while he remains there subject to court order, he should be placed where he can get such treatment, even if it means providing some maximum security facilities at some hospital other than Bridgewater.

Obviously Nason cannot be turned loose upon the community in his present state. It may be unlikely that he will ever be cured sufficiently to stand trial. Nevertheless, if he must be confined indefinitely, reasonable efforts must be made to improve his state so that the burdens of his necessary confinement will be reduced as far as practicable.

Efforts are being made to improve Bridgewater and to provide it with proper staff. Although the progress to date may have been slow, now that Bridgewater's serious deficiencies as a mental hospital have become apparent, we will not assume that "the necessary action to . . . [provide there] fully adequate treatment . . . already begun, will not be carried to completion." See *Commonwealth* v. *Hogan*, 341 Mass. 372, 376–377. Reasonable opportunity should be given not only to improve Bridgewater generally but also to afford to Nason proper therapy there. Qualified relief only (see *Miller* v. *Overholser*, 206 F. 2d 415, 419–421 [Ct. App. D. C.]; *United States* v. *Bishopp*, 286 F. 2d 320, 322–323 [2d Cir.]) should now be granted until there has been fair opportunity to effect necessary reforms. See *Tribby* v. *Cameron*, 379 F. 2d 104, 105 (Ct. App. D. C.); *Creek* v. *Stone*, 379 F. 2d 106, 110–112 (Ct. App. D. C.). See also G. L. c. 123, § 91 (as amended through St. 1959, c. 215, § 9), c. 248, §§ 15, 22, 23, 25; *Gentile, petitioner,* 339 Mass. 319, 322; *Stearns, petitioner,* 343 Mass. 53, 56–58; *Needel, petitioner,* 344 Mass. 260, 261; *Wright, petitioner,* 350 Mass. 123, 124; *Rohrer, petitioner, ante,* 282, 286–287.

We do not attempt to prescribe (see note 77 Yale L. J. 87, 107–114) what treatment should be given to Nason. We hold as to this only that a program for Nason's appropriate treatment is to be determined by competent doctors in their best judgment within the limits of permissible medical practice (see *Barrette* v. *Hight, ante,* 268, 276) and is to be followed diligently. We also do not attempt to state what changes should be made at Bridgewater. We merely determine that, if adequate treatment for Nason is not provided there within a reasonable time, the legality of his further confinement may be presented to the county court. Cf. *Watson* v. *Memphis,* 373 U. S. 526, 537–539; *State* v. *Rush,* 46 N. J. 399, 414–415.

3. The case is remanded for further proceedings consistent with this opinion to the county court, which shall retain jurisdiction.

*So ordered.*