FRANK E. NEWTON, petitioner.

Middlesex.    April 6, 1970. — May 1, 1970.

Present: WILKINS, C.J., SPALDING, CUTTER, REARDON, & QUIRICO, JJ.

*Sex Offender.*

Upon a petition for a writ of habeas corpus by one who had been committed under G. L. c. 123A, § 6, to the Bridgewater Treatment Center for an indeterminate term as a sexually dangerous person, evidence incorporated in the record and the subsidiary findings of the trial judge did not warrant his conclusion that the petitioner, who had been offered "appropriate treatment" at the center but who had refused such treatment and whose condition rendered it highly doubtful whether any treatment would benefit him materially, would not "within the foreseeable future" receive treatment at the center "essential for his continued lawful confinement" under the statute, and it was held that an order by the judge to release the petitioner was improvidently granted and that the petition must be dismissed, even if as "a borderline schizophrenic" the petitioner could be committed for treatment in a mental hospital and such treatment would be more advantageous to him.

PETITION for a writ of habeas corpus filed in the Superior Court on October 2, 1968.

The case was heard by *Mitchell, J.*

*Harold M. Brown,* Deputy Assistant Attorney General, for the Commonwealth.

*Michael R. Pizziferri (Joseph A. Todisco* with him) for the defendant.

CUTTER, J.   Newton was convicted in a District Court for indecent assault and battery.   While he was confined under a two and one-half year sentence at the Massachusetts Correctional Institution at Norfolk, a proceeding for his commitment to a treatment center as a sexually dangerous person was commenced under G. L. c. 123A, § 6.   After a hearing (January 12, 1968) he was committed to the Bridgewater Treatment Center (the center) for an indeterminate term.   A petition for a writ of habeas corpus was filed in the Superior Court on October 2, 1968. It is contended in effect that he was receiving only custodial care and not the treatment provided for by G. L. c. 123A.

A Superior Court judge made findings (summarized below) and rulings.   He concluded that "continued confinement of . . . [Newton] at the . . . Treatment Center without treatment, rehabilitation, or the reasonable expectation of treatment or rehabilitation in the foreseeable future" denied Newton various constitutional rights.   He ordered his release.   The case is before us on the Commonwealth's outline bill of exceptions incorporating designated portions of the evidence.   See S. J. C. Rule 1:22 (351 Mass. 742–745).

The following facts warranted by the evidence, among others, were found by the trial judge.

(a) In June, 1967, Newton was admitted to the center for sixty days of observation.   G. L. c. 123A, §§ 4, 6.   While there he was examined on several occasions by two physicians.   After his indeterminate commitment, Newton was "kept in a cell-like, eight by ten room with a wooden door and grated window.   There . . . [are] a bed, a table, a

chair, and a footlocker, but no plumbing facilities. There is a pot which is used for toilet facilities.[1] For the first six months . . . [Newton] was assigned to an orientation group which met for one hour once a week. . . . [He] did not attend all these meetings. . . . [He] did attend approximately twenty group sessions. This group consisted of newly admitted patients and was designed to orient each patient to the . . . [c]enter and to . . . [permit] an evaluation of the patient. After the first six months a new treatment assignment is made for the patients in any given group."

(b) When Newton's proposed therapy program was discussed, the staff felt that Newton was not getting benefit from his group psychotherapy, because the group's discussion was beyond his low intelligence. He has an I.Q. of about sixty.[2] He has not attended any group therapy sessions since June, 1968, nor has he at any time received any individual treatment. He was assigned to a new group, headed by a social worker, "but has steadfastly refused to attend these sessions." He "has been assigned to work in the shoe shop as a laster . . . five hours a day." He apparently has not "been assigned to an occupational or industrial therapist." There has been no psychiatric examination of Newton since his sixty day period of examination prior to his indeterminate commitment.

The trial judge failed to make findings on testimony offered by Newton's attorney through Dr. Leon Nathan Shapiro, a professor of psychiatry at Tufts University Medical School, concerning Newton's condition. Asked whether "Newton can receive adequate treatment or rehabilitation at the . . . [c]enter," he replied, ". . . if treatment is . . . doing something about a condition that exists in . . . Newton . . . the . . . [c]enter . . . cannot

---

[1] This appears from the evidence to have been for night use. Newton, at the center, the evidence shows, could have one visitor a week for an hour, opportunity for sports, television, radios, and reading material in his room, part-time use of an outside yard, participation in somewhat limited group activities, and work therapy.

[2] The evidence showed that Newton's I.Q. "ranges from a low in the sixties [moderately retarded] to a high of eighty-one, which is in the dull range."

do this . . . he is not treatable." [3] On cross-examination, he said that he meant that Newton "cannot be cured" and that he concurred with the opinion of State psychiatrists that, if Newton were "allowed to go out into society with no controls," he would "be a danger to society" in his present state. He replied to a question of the judge that Newton would receive as much treatment or better treatment in a correctional institution. He recognized, however, that the problem of dealing with him would arise once more at the end of Newton's sentence, when he would have to be released.

The judge also made findings concerning the staff and inmates of the center, as follows: "The population of the . . . [c]enter is approximately one hundred and sixty-five patients. One hundred and fifty . . . are indefinitely committed as sexually dangerous." The professional staff consists of one full-time psychiatrist, the director who is "in charge of the operation," and two part-time psychiatrists. One of these "spends three days a week at the . . . [c]enter or about eighteen to twenty-four hours per week." The other "spends about two days a week." The director "is in charge of the treatment and release procedure, and examines most of the patients when they are originally committed, although . . . [he] did not examine the petitioner at any time." He "also spends time in court testifying in cases involving patients . . . and maintains a private practice."

The part-time doctors "are primarily involved in the ob-

---

[3] His opinion was based on "twenty years of psychiatric experience with many cases of individuals who have markedly limited intelligence, poor reality testing, inability to function without careful and continuous supervision." No one, he said, "knows how to treat these people in order to change them in such a way that they could function without supervision. In that sense he is not treatable." Slightly more optimistic testimony was given concerning the possibility of benefit to Newton from group therapy, by one consultant at the center, although he had noticed no such benefit. He thought the revised program might be more effective and that it was "possible" that Newton could be restored to society with a program like this. Two staff members or consultants who testified at his commitment proceedings brought out Newton's substantial criminal and delinquency record. One doctor was unwilling to predict whether Newton "would ever physically harm anybody." The other thought it "very possible" that he might do so.

servation program. . . . There are four psychologists working full-time and two part-time psychologists . . . . The main function of the psychologists is psychotherapy," that is, "the psychological testing, treatment planning, and any research involving the patients . . . . There are three psychiatric social workers . . . two full-time and one employed four days a week." Their duties "involve treatment, psychotherapy and preparing social summaries." The staff also includes "a recreational therapist, an industrial and occupational therapist, and a senior physician to examine the patients medically. The staff . . . is at the maximum limit allowed by the Department of Mental Health," which "has proposed an increase of five positions," viz. "a mental health coordinator, a director of psychological research, a principal psychologist, a psychiatric social worker, and a senior occupational therapist."[4] The judge concluded "that at present there is not sufficient professional personnel . . . to give each . . . patient the psychiatric or psychotherapeutic treatment which could be considered in any way adequate for each patient's needs."[5]

The judge then reached general conclusions which, for reasons stated below, we do not deem pertinent to Newton's case. In effect, he stated that the inmates of the center present a variety of problems, mental characteristics, and

---

[4] The mental health coördinator at the center testified on October 7, 1968, that the "center staff . . . [then was] adequate in terms of training and professional expertise," but was not sufficient in numbers. He also testified concerning the State's pay scales for the new appointments, and pointed out that the State service was "not lucrative." Certain proposed salaries mentioned were well below those offered in some other States. He described Massachusetts as "forty-third on the list of professional pay."

[5] The judge, subject to exceptions saved by the Commonwealth, admitted testimony concerning the staffing of certain State mental institutions as compared with the staff at the center. On this evidence, which seems largely irrelevant to issues involving Newton, the judge made findings, "[T]he professional staff at Boston State Hospital consists of forty-one physicians, thirty-six psychiatric social workers and ten psychologists who treat 1,156 patients. At Medfield State Hospital, there are twenty-three physicians, six psychologists, and twelve psychiatric social workers available to treat 930 patients. At Worcester State Hospital, there are twenty-six physicians, eight psychologists, and nine psychiatric social workers available to treat 1,004 patients." These comparisons, of course, do not take into account the differences between (a) the varied mental conditions treated at the other institutions, and (b) the sex problems dealt with at the center.

dangerous potentials. "Due to lack of an adequate staff the . . . [c]enter has been unable to set up a variable personally developed response for each individual case necessary for adequate care." He concluded that the center "in its present state of organization and expertise is not able to treat or rehabilitate an individual such as" Newton and that he will not "within the foreseeable future . . . receive treatment and rehabilitation for his . . . condition . . . essential for his continued lawful confinement" under G. L. c. 123A.

1. General Laws c. 123A authorizes the civil commitment of sexually dangerous persons. See *Commonwealth* v. *Page*, 339 Mass. 313, 316–318; *Commonwealth* v. *Hogan*, 341 Mass. 372, 374–377; *Commonwealth* v. *Major*, 354 Mass. 666, 668. See also *Commonwealth* v. *Ackers*, 343 Mass. 63, 68; *Commonwealth* v. *McGruder*, 348 Mass. 712, cert. den. 383 U. S. 972; *Commonwealth* v. *Gomes*, 355 Mass. 479, 481–485. In the *Major* case (at p. 668), we said, "The justification for removing sexually dangerous persons from society, restraining their . . . freedom of action, and subjecting them to corrective treatment lies in assuring the safety of the general public as well as the . . . welfare of the dangerous person. As there is no certainty of cure,[6] and the outcome in any particular case cannot be predicted, the specified confinement is for from one day to life, and confinement . . . continues at least until there is sufficient improvement to warrant release on parole or there is a [court] finding . . . that the subject is no longer a sexually dangerous person (§ 9). The statute . . . does not intend punishment and does not in terms impose it, and nothing . . . [in it] justifies punitive treatment or confinement under any prison conditions, except

---

[6] On the issue of certainty of cure, there was testimony from the mental health coördinator at the center that no one "knows what the most effective treatment is for sexually dangerous persons." The center can only "offer a man a treatment program and whether he refuses or accepts it is up to" him. This witness apparently entertains only limited hope that group treatment would do more than "perhaps strengthen some [of Newton's] controls." The "best possible [treatment] program" would consist of "psychotherapy designed specifically to enhance . . . [Newton's] ability to control . . . [his] sexual impulses . . . and . . . to socialize him." This treatment could be found at the center.

such as are reasonably required for security. . . . Indeed, implicit in the statute . . . is the obligation to provide an environment conducive to a cure or an alleviation of the dangerous trait. *Nason* v. *Superintendent of Bridgewater State Hosp.* 353 Mass. 604, 613." In the *Nason* case (at p. 614), with respect to other treatment, we said that we did "not attempt to prescribe . . . what treatment should be given" but held "only that a program for . . . appropriate treatment is to be determined by competent doctors in their best judgment within the limits of permissible . . . practice . . . and is to be followed diligently."

In the present case, the requirement of "appropriate treatment" means no more than that Newton shall be offered treatment which is suitable for him to the best of the staff's collective judgment. The evidence does not support the conclusion that, as to Newton, the center's treatment is in fact inadequate, or that the more intensive treatment would be of material benefit. It is highly doubtful whether any treatment will help Newton, in the light of Dr. Shapiro's testimony (about his limitations) already mentioned (see fn. 3), and the uncertainty that success will follow any form of treatment of sexually dangerous persons (see fn. 6). Newton has refused treatment (posing no threat to his physical well-being) designed to help him, and thus he is not now in a position to complain about its inadequacy.

We hold that the trial judge's conclusion, that Newton will not receive adequate treatment, is not warranted by either the subsidiary findings or the evidence incorporated in this record. We thus need not discuss various exceptions to the admission of evidence.

2. It may be that (a) Newton, as "a borderline schizophrenic" could be committed for treatment in a mental hospital and that such treatment would be more advantageous to him. He, however, was committed under G. L. c. 123A. That chapter (§ 6, as appearing in St. 1958, c. 646, § 1) permits a person found to be "sexually dangerous" to be committed to the center. This is a reasonable legislative

determination of at least one form of appropriate treatment. It is not for the courts to substitute their judgment (for that of the Legislature), unless the treatment offered at the center falls, in a particular case, outside the permissible range of appropriate treatment under the decisions already cited. The committing judge need not require the use of other measures for treatment in circumstances such as here appear. See *Commonwealth* v. *Dagle*, 345 Mass. 539, 542–543. Where no showing has been made that Newton has been cured, or that his treatment is inadequate or inappropriate for him, his release or a different commitment is not required.

3. This court (see the *Hogan* case, 341 Mass. 372, 376–377) has expressed concern that, for particular inmates (a) treatment at the center may be shown to be inadequate, and (b) the treatment and environment may be proved to be not conducive to affording reasonable chance for a cure and for reducing the burdens of confinement. See the *Nason* case, 353 Mass. 604, 611–614, esp. at p. 613. Newton's own circumstances (see e.g. fns. 2, 3, 6) do not raise such an issue.[7]

4. The order of the trial judge was improvidently issued. The exceptions are sustained and the petition must be dismissed.

*So ordered.*

---

[7] Some of the subsidiary findings and some of the evidence (see e.g. fns. 1, 4, 5) suggest, however, the need of continuing efforts to improve the center's facilities, to augment its staff, and (by offering proper compensation) to attract suitable professional assistance. The record does not reveal what progress has been made in improving the facilities and staff of the center in the period since the hearings in the Superior Court in October, 1968.