Gants, J.
On September 18, 2000, after a probable cause hearing, this Court found probable cause to believe that the defendant, Michael Kamper, is a sexually dangerous person as defined under G.L.c. 123A, §1. Specifically, this Court found probable cause to believe that Mr. Kamper has been convicted of a sexual offense and suffers from a mental abnormality — pedophilia — which makes him likely to engage in sexual offenses if not confined to a secure facility.
Two issues remain to be resolved before Mr. Kamper goes to trial on December 18, 2000. First, after this Court’s finding of probable cause, the Supreme Judicial Court issued its decision in Commonwealth v. Lawrence A. Bruno, which declared that the meaning of “probable cause” as used in G.L.c. 123A, §12(c) was not the probable cause to arrest standard but rather the “directed verdict” standard used in probable cause bind-over hearings under G.L.c. 276, §38. 432 Mass. 489, 2000 WL 1434452, *1, *12 (September 29, 2000). *294 Since this Court had used the traditional probable cause standard and not the higher “directed verdict” standard now required under Bruno, this Court sua sponte must revisit its finding of probable cause.
Second, at the probable cause hearing, this Court learned that the defendant, although he had received sexual offender treatment while still in criminal custody, has been denied sexual offender treatment by the Department of Correction (“DOC”) since he completed his criminal sentence and entered into civil custody. A hearing was held on this issue on September 28, 2000, where the DOC declared that it would continue to refuse the defendant any sexual offender treatment unless and until he is adjudicated a sexually dangerous person after trial. This Court in this decision declares its findings on this issue.
“Probable Cause” Under the “Directed Verdict” Standard
To determine whether the evidence at the probable cause hearing continues to support a finding of “probable cause” under the “directed verdict” standard set forth in Bruno, this Court must first determine what the “directed verdict” standard is and how it compares to the traditional probable cause standard. In Bruno, the Supreme Judicial Court both quoted and cited with approval the case of Myers v. Commonwealth, 363 Mass. 843 (1973), which interpreted the meaning of probable cause in the context of a District Court hearing to bind over to the Superior Court a defendant accused of serious felonies. Bruno, 2000 WL 1434452 at *12. From Myers, one can discern that the determination under G.L.c. 123A, § 12(c) of whether probable cause exists to believe that the defendant is a sexually dangerous person:
1. requires more evidence than probable cause for arrest but less than proof beyond a reasonable doubt; Myers at 850; Bruno at *12;
2. requires the factfinder to evaluate the credibility of witnesses and the quality of the evidence introduced; Myers at 853; and
3. is analogous to the court’s ruling on a motion for a directed verdict in that “(t]he examining magistrate should view the case as if it were a trial and he were required to rule on whether there is enough credible evidence to send the case to the jury.” Myers at 856.
It is plain from Myers that the “directed verdict” standard is simply “analogous” to the civil directed verdict standard and not identical to it. Id. at 850. If the standards were identical, it would require the factfinder at a probable cause hearing under G.L.c. 123A, § 12(c) to view the evidence in the light most favorable to the prosecution and determine whether the evidence viewed in that light is sufficient reasonably to support a finding that the defendant is a sexually dangerous person. See Cambridgeport Savings Bank v. Boersner, 413 Mass. 432, 438 (1992). Under the traditional directed verdict standard, the court is not permitted to weigh the credibility of the witnesses or otherwise consider the weight of the evidence. Id. If this civil “directed verdict” standard were to be used in probable cause determinations under G.L.c. 123A, § 12(c), probable cause could be found in cases that would not pass muster under the traditional probable cause standard because the court is permitted to consider credibility when it determines traditional probable cause and would be barred from this consideration in determining “directed verdict” probable cause. Indeed, it would mean that a court must find probable cause to believe the defendant to be sexually dangerous whenever the Commonwealth presents evidence, regardless of how incredible, that would be sufficient, if believed, to find beyond a reasonable doubt that the defendant is a sexually dangerous person. In Myers, the Supreme Judicial Court made it clear that this would not be enough to bind over a defendant to Superior Court: there must be “credible evidence” sufficient to permit a rational trier of fact to find the defendant guilty. Myers at 850.
Therefore, this Court concludes that the “directed verdict” standard of probable cause set forth in Bruno requires this Court first to determine the evidence it finds credible and then, considering only that credible evidence, determine whether a reasonable trier of fact could find the defendant to be a sexually dangerous person based on that credible evidence. Using this modified “directed verdict” standard, this Court continues to conclude that there is probable cause to believe that the defendant is a sexually dangerous person as defined under G.L.c. 123A, §1.
It should be noted that, at the probable cause hearing, the Commonwealth offered the expert testimony of Dr. Robert Joss, a forensic psychologist and qualified examiner. Although the defendant challenged the admissibility of Dr. Joss’s testimony on Daubert/Lanigan grounds, this Court did not hold a Daubert/Lanigan hearing or otherwise thoroughly consider whether the Commonwealth had laid “an adequate foundation either by establishing general acceptance in the scientific community or by showing that the evidence is reliable or valid through an alternate means.” Canavan’s Case, 432 Mass. 304, 310 (2000). No Daubert/Lanigan challenge had been presented in advance of the hearing and, pragmatically, a thorough examination of these issues would have required a substantial postponement of the probable cause hearing, which already had been delayed nearly three months. This Court’s admission of Dr. Joss’s testimony at the probable cause hearing, therefore, should not be construed as a finding by this Court that it would also be admissible at trial.
In order to permit the timely resolution of all Daubert/Lanigan issues in advance of the December 18 trial, this Court orders the Commonwealth to identify any expert witnesses it plans to call at trial no later *295 than December 1, 2000 and to provide the defense by that date with a report detailing each expert’s expected testimony. This report should also summarize' the evidence supporting the contention that the expert’s opinion is either generally accepted in the scientific community or reliable or valid through other means. The defendant shall inform the Court no later than December 8, 2000 whether he intends to challenge the admissibility of any expert’s testimony on Daubert/Lanigan grounds and whether he seeks a hearing as to its admissibility. Also by December 8, 2000, the defendant shall provide the Commonwealth with a report detailing its experts’ expected testimony and summarizing the evidence supporting the contention that its experts’ opinions are either generally accepted in the scientific community or reliable or valid through other means. The Commonwealth shall inform the Court no later than December 11, 2000 whether it intends to challenge the admissibility of any expert’s testimony on Daubert/Lanigan grounds and whether it seeks a hearing as to its admissibility.
Sexual Offender Treatment
The defendant, having pleaded guilty to five counts of rape of a child and five counts of indecent assault and battery on a child under the age of 14, has been serving a prison term since 1995. Under G.L.c. 123A, § 12(a), six months before the date the defendant was scheduled to be released from his prison term for commission of these sexual offenses, the DOC was obligated to notify the Essex County District Attorney in writing of his anticipated release. There is no dispute that the DOC failed to comply with this obligation. As a result, the Essex County District Attorney learned of Mr. Kamper’s scheduled release on or around June 16, 2000, the date of his scheduled release. As a result of this illegal and inadequate notice, the District Attorney moved immediately under G.L.c. 123A, §12(e) to commit the defendant temporarily to the treatment center to avoid his imminent release from custody.
The defendant has been severely prejudiced in two ways by the DOC’s failure to comply with the dictates of G.L.c. 123A, §12(a). First, if six months notice had been given as required and the District Attorney had promptly filed the sexually dangerous person petition, the defendant would have remained in criminal custody on his criminal sentence pending the final adjudication of whether he is a sexually dangerous person. See Bruno, supra at *16 (“The Commonwealth acknowledges that in future cases it should receive six months’ notice of an inmate’s release date and therefore could obtain the necessary evidence and even complete the final commitment hearing before that date”). As a result of the DOC’s violation of law, the sexually dangerous person petition was only filed when the defendant completed his prison term on June 16, 2000, and he has been held in civil custody since that date, awaiting trial on the sexually dangerous person petition. If the defendant is found at trial not to be a sexually dangerous person as defined under G.L.c. 123A, §1, then the DOC will have unfairly deprived the defendant of six months of liberty.
Second, if six months notice had been given as required and the District Attorney had promptly filed the sexually dangerous person petition, the defendant would have remained in criminal custody and continued to receive sexual offender treatment until the final adjudication of the sexually dangerous person petition. As a result of the DOC’s violation of law, the defendant, who had continued to receive sexual offender treatment until the completion of his prison term and continued to seek such treatment, was denied any sexual offender treatment once his prison term expired on June 16, 2000. In short, once the defendant moved from criminal to civil custody, he was deprived of any sexual offender treatment and will continue to be so deprived unless and until he is adjudicated a sexually dangerous person at trial.
While the first source of unfair prejudice means that the defendant will have been needlessly deprived of his liberty for roughly six months if he is found not to be sexually dangerous, this second source of unfair prejudice means that his civil custody will likely be needlessly prolonged if he is found to be sexually dangerous. Dr. Joss, the Commonwealth’s expert forensic psychologist and qualified examiner, testified at the probable cause hearing that the defendant is a pedophile, and that this mental abnormality makes him likely to engage in sexual offenses if not confined to a secure facility. However, Dr. Joss also testified that, once the defendant successfully completed Phase IV of the Sex Offender Treatment Program (“SOTP"), “he should be able to continue his treatment through one of the [outpatient] programs listed [by Dr. Joss in his report] as a condition of his probation.” Phrased differently, Dr. Joss has opined that, should the defendant successfully complete Phase IV of the SOTP, he would no longer be a “sexually dangerous person” as defined under G.L.c. 123A, §1 because he would no longer be likely to engage in sexual offenses if he complied with a probation condition that included outpatient treatment at one of these programs.
If the DOC had not violated the law, the defendant would have learned while in sexual offender treatment that the Commonwealth deemed his successful completion of Phase IV a pre-requisite to his release, and this incentive may have focused his mind on achieving that goal. As a result of the violation, the defendant has learned of this prerequisite at a time when he cannot make any progress in sexual offender treatment because he has been denied all such treatment. In addition, if the DOC had not violated the law, the defendant’s sexual offender treatment would have been seamless if he were adjudicated to be a sexually dangerous person, since, if the time limits set forth in G.L.c. 123A were followed, his trial would have been *296 completed before the expiration of his prison term. This would have meant that he would have moved immediately from the sexual offender treatment he received as a convict into the sexual offender treatment he would receive as an adjudicated sexually dangerous person. As a result of the violation, his sexual offender treatment will have been interrupted for at least six months (longer if the trial is delayed), and, because of the interruption of his treatment, his completion of Phase IV will likely have been delayed even longer.
The DOC's failure to give the required six months notice of release, combined with its decision to deny the defendant any sex offender treatment while in' temporary civil custody, places him in a tragic dilemma reminiscent of Joseph Heller’s “Catch-22.” According to the Commonwealth, he cannot be safely released until he completes Phase IV of the SOTP, but he cannot complete Phase IV because the Commonwealth will not provide him with any treatment.
The existence of DOC’s violation of law and the substantial unfair prejudice caused by this violation invites inquiry into an appropriate remedy. One remedy would be the immediate release of the defendant, but this remedy is unacceptable in view of the Court’s finding of probable cause to believe that the defendant remains sexually dangerous. There is another remedy which cannot eliminate the prejudice but can mitigate it, and can do so without risk to the publicordering the DOC to return the defendant to sexual offender treatment pending the final adjudication of this petition. The DOC vigorously objects to this remedy. Indeed, the DOC objects to any remedy and insists on maintaining the status quo. To evaluate the DOC’s position, it is important both to understand the status quo and to examine the DOC’s reasons for claiming that sexual offender treatment cannot be provided to the defendant while he awaits trial.
According to the “Plan for the Administration and Management of the Massachusetts Treatment Center for Sexually Dangerous Person” (“the Plan”), enacted on December 10, 1999, individuals, like the defendant, who are temporarily committed to the treatment center awaiting trial on their sexually dangerous person petitions, are housed in an observation unit of the treatment center. Plan at 32-33. Although the only reason they are there is that a court has found probable cause to believe they suffer from “a mental abnormality or personality disorder which makes such person likely to engage in sexual offenses if not confined to a secure facility,” G.L.c. 123A, § 1, they are not given “any sex offender specific treatment.” Plan at 33. Rather, the Plan provides that “individual issues will be addressed by the sex offender treatment provider if the offender requests them.” Plan at 33. When this Court asked the DOC attorney what this meant in practice, he responded that a treatment center psychologist has office hours one day each week for one or two hours, and a person awaiting trial could ask to see her during those office hours. These individuals will remain in the Observation Unit for the entirety of their civil commitment pending trial, even before and after the 60 day period set for “examination and diagnosis” after the finding of probable cause. See G.L.c. 123A, §13(a). In short, those, like the defendant, who are temporarily committed are confined in a treatment center that refuses to treat them and housed in an observation unit that, except for the sixty day period of “examination and diagnosis,” does not observe them.
Dr. Barbara Schwartz, the Clinical Director of the SOTP, declared in her affidavit:
Mr. Hamper is not provided with treatment while he is awaiting resolution of his commitment proceeding because this would involve therapists in the evaluative process. Their opinions could then be utilized in the commitment proceedings creating a conflict of interest. Our treatment program is designed to address therapeutic issues after commitment has been accomplished.
What is perplexing about this rationale is that SOTP therapists appear inherently to be involved in the evaluative process. Indeed, under the Sex Offender Treatment Agreement/Waiver he must sign to obtain sex offender treatment, Mr. Hamper was required to grant the following permission:
I give my designated sex offender therapist permission to share information concerning my progress in treatment and other pertinent evaluative information with the Department of Correction and/or Parole, in order that those agencies may evaluate my appropriateness relative to such issues as classification, housing level, lower security, release, etc.
Exhibit 2. Moreover, under this rationale, sex offender treatment would never be made available to persons civilly committed as sexually dangerous persons, because such persons are entitled to file a petition for discharge every twelve months. G.L.c. 123A, §9. Consequently, the commitment proceedings never truly cease; they may be renewed every year the person remains civilly committed. Finally, therapists involved in treatment would not have any “conflict of interest" in testifying. If called to testify, they would simply be fact witnesses required to speak the truth as they understand the truth. Certainly Dr. Schwartz is not suggesting that therapists would have any professional or fiduciary obligation to provide information favorable to the Commonwealth simply because they are employed by the Commonwealth. Police officers in criminal cases are required to testify to the truth and “let the chips fall as they may” regardless of whether their testimony will lead to conviction or acquittal, and nobody refers to their obligation to testify as a conflict of interest.
Robert Murphy, the Superintendent of the Massachusetts Treatment Center, provided an entirely dif *297 ferent rationale for denying temporarily committed sex offenders any sex offender treatment. He wrote in his affidavit:
I have made this decision based on many'factors, including the unique nature and relatively short duration of the stay of temporarily committed men. The Treatment Center uses the currently recommended method for treating sex offenders. This method is known as the cognitive-behavioral approach and is primarily structured around involvement in group therapy and psycho-educational classes. The treatment process is a lengthy one. Thus, based on the Treatment Center’s and may experience and expertise, I have determined that it would not be practical to make sex offender specific treatment available to these temporarily committed men. In addition to be unlikely to significantly aid these temporarily civilly committed men, it may potentially cause a serious disruption to a group dynamic which often takes a long time to establish. In addition, psycho-educational classes last an average of three months and are offered in four semesters throughout the year. Should a specific sex offender treatment issue arise in connection with a temporarily committed man, the Treatment Center is prepared to respond on a case-by-case basis, as is necessary, reasonable and appropriate.
In considering Superintendent Murphy’s explanation, it is interesting to note that Dr. Schwartz, the SOTP’s Clinical Director and the person directly responsible for sex offender treatment, said nothing about sex offender treatment being impractical for men temporarily civilly committed. Moreover, while the concerns raised by Superintendent Murphy arguably may apply to persons who had not been receiving sexual offender treatment, he does not explain how or why it would apply to a person, like the defendant, who had been receiving sexual offender treatment as a criminal state inmate until the day he was civilly committed. There is no evidence that the SOTP stops treatment for those criminally committed who are approaching the end of their prison term. Indeed, there is evidence that the SOTP was discussing whether the defendant should remain in Phase III through May 2000, only one month before his mandatory release date. The Superintendent gives no explanation why it is less disruptive to the SOTP and its patients to remove a patient from treatment altogether and return him to treatment six months later than it is to leave a patient in treatment without interruption. Nor does the Superintendent appear to recognize that even persons adjudicated to be sexually dangerous may file a petition for discharge every twelve months, so the duration of the stay of everyone civilly committed to the SOTP remains uncertain beyond one year. Finally, even if “psycho-educational classes last an average of three months,” a defendant’s temporary commitment following his probable cause finding will be at least three to four months the law gives the Commonwealth forty-five days to complete its examination and diagnosis, another fourteen days for the District Attorney to determine whether he will proceed to trial, and up to sixty additional days for the trial to commence. G.L.c. 123A, §§13 and 14.
Having examined the DOC’s arguments, this Court can find no credible reason why the DOC should not be ordered to return the defendant to sexual offender treatment pending the final adjudication of this petition as a partial remedy to mitigate the needless and unfair prejudice it has caused the defendant by its failure to comply with the clear mandate of G.L.c. 123A, §12{a) to provide the Essex County District Attorney with six months written notice of the defendant’s scheduled release date. This Court shall not dictate to the DOC the nature of the required treatment. Such treatment, however, must be comparable to the sexual offender treatment that the defendant was receiving as a criminal inmate and that he would have continued to receive pending the adjudication of this civil commitment proceeding had proper advance notice been given. Nothing in this Order is intended to interfere with the examination and diagnosis that the defendant is receiving under G.L.c. 123A, § 13(a).
The DOC has moved this Court to stay any Order requiring treatment so that the DOC can appeal. The DOC’s motion to stay is denied. The damage to the defendant caused by the DOC’s violation of law is irreparable and continuing, and there is no reason to add to that damage pending appeal. Moreover, the balance of harms plainly favors the defendant. The only consequence of this Order is that the DOC must furnish to the defendant the sexual offender treatment it had provided him as a criminal inmate until June 16, 2000. The consequence of a stay would be that, if he were adjudicated to be a sexually dangerous person, his time in civil custody would be prolonged because he would have lost precious time towards his completion of the necessary Phase IV treatment. Finally, the likelihood of the DOC prevailing on appeal is slim. This Court’s Order was necessitated by the DOC’s own violation of law and is intended solely as a remedy (albeit an inadequate remedy) for the unfair prejudice caused by that violation. The Appeals Court is unlikely to deny the Superior Court a remedy to deter future violations by the DOC and to mitigate the harm created by such violations.[1]

ORDER

For the reasons detailed above, this Court hereby ORDERS that:
1. Using the modified “directed verdict” standard set forth in Bruno, this Court continues to conclude that there is probable cause to believe that the defendant is a sexually dangerous person as defined under G.L.c. 123A, §1.
*298 2. In order to permit a timely resolution of any Daubert/Lanigan issues in advance of the December 18, 2000 trial, the Commonwealth shall identify any expert witnesses it plans to call at trial no later than December 1,2000 and provide the defense by that date with a report detailing each expert’s expected testimony. This report should also summarize the evidence supporting the contention that the expert’s opinion is either generally accepted in the scientific community or reliable or valid through other means. The defendant shall inform the Court no later than December 8, 2000 whether he intends to challenge the admissibility of any expert’s testimony on Daubert/Lanigan grounds and whether he seeks a hearing as to its admissibility. Also by December 8, 2000, the defendant shall provide the Commonwealth with a report detailing its experts’ expected testimony, and summarizing the evidence supporting the contention that the expert’s opinion is either generally accepted in the scientific community or reliable or valid through other means. The Commonwealth shall inform the Court no later than December 11, 2000 whether it intends to challenge the admissibility of any expert’s testimony on Daubert/Lanigan grounds and whether it seeks a hearing as to its admissibility.
3. The DOC is ordered to return the defendant to sexual offender treatment pending the final adjudication of this petition as a partial remedy to mitigate the needless and unfair prejudice it has caused the defendant by its failure to comply with the clear mandate of G.L.c. 123A, § 12(a) to provide the Essex County District Attorney with six months written notice of the defendant’s scheduled release date. This Court shall not dictate to the DOC the nature of the required treatment. Such treatment, however, must be comparable to the sexual offender treatment that the defendant was receiving as a criminal inmate and would have continued to receive pending the adjudication of this civil commitment proceeding had proper advance notice been given. Nothing in this Order is intended to interfere with the examination and diagnosis that the defendant is receiving under G.L.c. 123A, §13(a).
4. The DOC’s motion for a stay of this Order pending appeal is DENIED.

 It should be made clear that this Court is aware that the Supreme Judicial Court in Bruno declared, “There has been no showing that [the Commissioner of Correction] has abused that discretion in holding those temporarily committed in accordance with those rules and regulations [in the Plan], Nor has there been any showing that the manner and conditions under which those temporarily committed are held is unconstitutional. Similarly, there is no basis for that aspect of the commitment order that directs treatment for Wilson." Bruno, supra at *16. This decision is not at all in conflict with that decision because this Court, unlike the court referenced in Bruno, is simply providing a remedy for the DOC's violation of its legal obligation to give six months written notice of the defendant’s scheduled release. This Court is not resting its order to provide sex offender treatment on any right to treatment in the absence of such a violation by the DOC.
Having said that, this Court does not agree with the DOC’s assertion in its brief that the Bruno decision finally disposes of any claim that there is a constitutional right to treatment for those temporarily committed. The Superior Court that directed treatment for Wilson did so without any explanation of fact or law. Given that background, it is not surprising that the Supreme Judicial Court devoted only one paragraph to this subject and found no showing of unconstitutionality. In view of the existing constitutional jurisprudence, the Supreme Judicial Court’s finding that there was no showing of unconstitutionality should not be interpreted as a legal determination that a civil commitment, even one temporary in nature, carries no due process right to treatment.
The Supreme Judicial Court has held that commitments under G.L.c. 123A are civil in nature and remedial in purpose. See Bruno, supra at *7; Sheridan, Petitioner, 412 Mass. 599, 604 (1992) (“[T]he primary objective of c. 123A ... is to care for, treat, and, it is hoped, rehabilitate the sexually dangerous person, while at the same time protecting society from this person’s violent, aggressive, and compulsive behaviors"); Trimmer, Petitioner, 375 Mass. 588, 590 (1978), quoting LaMorre v. Superintendent of Bridgewater State Hosp., 347 Mass. 534, 538 (1964) (c. 123A’s purposes are “to ascertain who are sexually dangerous persons for the protection of society, and to cure and rehabilitate them as soon as possible”). The conclusion that G.L.c. 123A commitments are civil in nature rests, at least in part, on the statute’s requirement that those adjudicated sexually dangerous be assigned to a treatment center “for [the] care, custody, treatment and rehabilitation” of such persons. G.L.c. 123A, §2. Certainly, given the Commonwealth's recognition that treatment exists for the sexually dangerous and at times is effective, it would be a violation of both c. 123A and due process to civilly commit the sexually dangerous without providing any treatment for the mental abnormality or personality disorder that caused their civil commitment See Newton, Petitioner, 357 Mass. 346, 351-52 (1970), quoting Commonwealth v. Major, 354 Mass. 666, 668 (1968) (“[IJmplicit in the statute ... is the obligation to provide an environment conducive to a cure or an alleviation of the dangerous trait”) (cite omitted); Commonwealth v. Page, 339 Mass. 313, 317-18 (1959) (sex offender treatment program must be remedial to satisfy constitutional requirements of due process); Youngberg v. Romeo, 457 U.S. 307, 322 (1982) (“minimally adequate training” required by due process for those involuntarily civilly committed for mental illness); Kansas v. Hendricks, 521 U.S. 346, 366 (1997) (state did not act with punitive intent when it “recommended treatment if such is possible”).
A person who is temporarily committed to the treatment center at the conclusion of his prison term is held through a civil commitment. That civil commitment rests only on a finding of probable cause or a modified “directed verdict” rather than proof beyond a reasonable doubt, but the lower burden of proof does not change the civil nature of the commitment; it simply limits the duration of the civil commitment that may be premised on such proof. Where treatment is available and potentially effective, neither the Supreme Judicial Court nor the United States Supreme Court have ever held that a state may withhold all treatment and still contend that a commitment statute is remedial, rather than punitive, in purpose. Cf. Kansas v. Hendricks, 521 U.S. at 366 (Constitution does not prevent a state from civilly detaining those for whom no treatment is available, such as those with a contagious, untrealable disease). This Court does not believe that the Supreme Judicial Court in Bruno intended to break new constitutional ground in a single paragraph without extensive analysis. Indeed, this Court does not believe that the Supreme Judicial Court, as a matter of due process, would permit the Commonwealth to civilly commit any person for a period as long as three months when the Commonwealth refused to provide treatment for the problem that triggered the commitment and such treatment existed and was poten *299 tially effective. It may be that the DOC will argue that sexual offender treatment does not exist or cannot potentially be effective for a temporarily committed sexual offender, but that argument, as demonstrated earlier, is difficult to make with respect to a person who had been receiving sexual offender training for many years up to the date his temporary commitment commenced.