MARGARET C. BELGER *vs.* ROBERT E. ARNOT.

Norfolk.   April 5, 1962. — July 3, 1962.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, KIRK, & SPIEGEL, JJ.

*Insane Person. Assault. Doctor. Practice, Civil,* Requests, rulings and instructions. *Husband and Wife,* Insane spouse. *Pleading, Civil,* Declaration. *Words,* "Assault."

Refusal by a judge, who heard an action without jury and made only a general finding for the plaintiff, to rule as requested by the defendant that the evidence warranted a finding in his favor would be reversible error if the evidence permitted a finding for the defendant. [680]

Where a judge who heard an action without jury found for the plaintiff on a count of the declaration alleging that the defendant assaulted her by imprisoning and restraining her in a mental hospital and for the defendant on a count alleging that he imprisoned and restrained her there, the reference to false imprisonment in the first count could be treated as surplusage and that count construed as stating a cause of action for assault. [681]

At the trial of an action for assault by a woman against a psychiatrist whose attendants at a mental hospital took the plaintiff by the arms or "grabbed" her and confined her there against her will for not more than ten days, during which she was given electric shock treatments, evidence warranted findings that the plaintiff was in need of immediate care and treatment because of mental derangement, with a reasonable possibility of her doing harm to herself or others, that the defendant, who had made such a diagnosis, acted in good faith and without negligence, and that he was privileged under G. L. c. 123, § 79, and was not liable to the plaintiff. [684–686]

The consent of a husband to proper care and treatment of his mentally deranged wife is a bar to an action of assault and battery by her against a physician based on such care and treatment if her condition created danger of harm to her or to others.   [686–687]

TORT.   Writ in the Superior Court dated October 30, 1957.

The action was heard by *Dewing,* J.

*Leon F. Sargent* for the defendant.

*Walter Powers, Jr.* for the plaintiff.

*John F. Dunn & Charles J. Dunn,* for Massachusetts Medical Society, amicus curiae, submitted a brief.

WILKINS, C.J.   The plaintiff sues the defendant, a psychiatrist, in tort for damages arising out of her confinement in Bournewood, a mental hospital in Brookline.   The declaration is in three counts.   Count 1 is for causing an assault by imprisoning and restraining her against her will in Bournewood.   Count 2 is for causing her to be imprisoned and restrained of her liberty in Bournewood for a long period of time against her will.   Count 3 is for negligent diagnosis and treatment by a physician.   The answer contains a general denial; allegations of contributory negligence and wrongful conduct on the part of the plaintiff; and allegations that because the plaintiff was mentally ill and in immediate need of medical treatment the defendant duly arranged for such treatment at Bournewood in accordance with G. L. c. 123.   The judge found for the plaintiff on count 1, and for the defendant on counts 2 and 3.   The defendant's exceptions relate to the denial of his requests for rulings numbered 5, 6, and 16.   These rulings present the only issues before us.

1.   The sixteenth request was: "The evidence warrants a finding for the defendant under Count 1 of the plaintiff's declaration."   The judge made only a general finding. Hence, if there was evidence which would permit a finding for the defendant, the refusal of the request was error. *Bresnick* v. *Heath,* 292 Mass. 293, 298–299.   *Quality Fin. Co.* v. *Hurley,* 337 Mass. 150, 152.   The plaintiff's brief does not mention this request, but is largely concerned with

arguing that the evidence warranted a finding in her favor. This, as we have indicated many times, does not meet the point. *Rummel* v. *Peters,* 314 Mass. 504, 517–518. *Hoffman* v. *Chelsea,* 315 Mass. 54, 56. *Brodeur* v. *Seymour,* 315 Mass. 527, 529–530. *Liberatore* v. *Framingham,* 315 Mass. 538, 541–542. *Lawrence* v. *O'Neill,* 317 Mass. 393, 395. *Rock-Ola Mfg. Corp.* v. *Music & Television Corp.* 339 Mass. 416, 422.

A preliminary analysis of count 1 is needed in the light of the judge's findings. The finding for the defendant on count 2 means that there was no false imprisonment. Count 1 charges an assault by false imprisonment, so the judge must have found that there was only an assault. The reference to false imprisonment in count 1 may be treated as surplusage, where the remaining allegations state a cause of action. *Wolfson* v. *Fox,* 338 Mass. 603, 604. The immediate question now becomes whether there was evidence which would warrant a finding that no assault was committed. By "assault" the declaration is to be understood as comprehending an allegation that there was a "battery." The parties seem to have so treated it. See *Commonwealth* v. *Ruggles,* 6 Allen, 588, 590–591; Restatement: Torts, §§ 13, 21.

The defendant contends that there was evidence supporting such a finding on three grounds: (1) authority conferred under G. L. c. 123, § 79; (2) the written authorization of the plaintiff's husband for the administration of electric shock therapy; and (3) the plaintiff's voluntary application for care and treatment under G. L. c. 123, § 86.

We state certain pertinent testimony, beginning with that of the defendant. The plaintiff was referred to him by Dr. Frederick W. O'Brien, who was treating her for cancer, and who gave him information on the plaintiff's marital difficulties and background. He first saw the husband in order to obtain some history of the plaintiff and to appraise the husband as a person. He then saw the plaintiff on October 30, 1956, at Bournewood. He spent between thirty and sixty minutes with her in order to evaluate her marital

problems and to seek solutions. She told him, "God directs me in many things." "I met with God on that Greyhound bus." She asked God, "Where have I failed?" and the answer on the bus was, "Tell Bill to look within himself." The bus incident occurred ten years previously, but she stated in the present tense that God directs her in many things. On October 30, the defendant made a diagnosis of "Involutional psychotic reaction, paranoid type," and a final note that he would prefer her to have electric shock treatments, but not that day. She was then as much in need of temporary care as on November 3, but he would not sign the "temporary care" paper with no member of the family present. On November 3 the plaintiff and her husband came to him at the hospital. At that time he felt that she was sick and recommended that she stay in the hospital. "She refused, and the ten day paper was then signed. Doctors and nurses were called and they took her to a ward." In the "temporary care" paper he wrote, "This patient has been manic in her activity and also paranoid. She feels that her actions are directed by God. She is in need of immediate hospitalization." "In his opinion, if at the time of the admission to the hospital, the plaintiff was not treated there would have been a possibility that she might hurt herself or someone else. That is a real risk in an involutional psychosis illness." On November 3 the husband signed a permit, authorizing him and the hospital to administer electric shock treatments. He did not believe that the plaintiff ever specifically gave such permission, but he assumed that the husband, despite marital difficulties, was authorized. The electric shock treatments were administered by the defendant on November 6, 7, 8, 10, 13, 15, 17, and 20. A treatment causes a temporary loss of memory for the period immediately preceding, and consecutive treatments produce a greater temporary loss of memory. If memory is affected, judgment is affected. The treatments had no other physical effects on the plaintiff. He was not present when the plaintiff signed the "voluntary paper." After treatments were started she showed good

improvement. After the eighth treatment she was discharged with the definite understanding that she would return. Eight treatments were not enough, and it was a mistake in judgment to let her go. She went home, and never returned.

A written statement of the husband, admitted in evidence by agreement, was to the effect that on November 3, when the plaintiff refused to remain, the defendant used a telephone; that a nurse and doctor appeared, "took her by the arms and walked her out of the office"; that she protested, but did not scream; and that she was not dragged, drugged, nor given a needle.

The plaintiff's own testimony in some respects was different. She drove her husband to Bournewood and met the defendant in an office. In a visit, which lasted one-half hour, in the presence of her husband the defendant and she discussed life, philosophy, what she believed in, and her troubles at home. "While [they were] discussing these matters, three men appeared from somewhere and grabbed her. She did not know who the three men were; they were attendants. She rebelled and was physically fighting. . . . The attendants took her to one of the more serious ladies wards where hospital privileges were not allowed, and there confined her to bed."

Dr. Charles Saltzman testified that he was a physician psychiatrist and acting superintendent of Bournewood; that he saw the plaintiff daily during her stay at the hospital from November 3 to 20, 1956; that it was his diagnostic impression that "the plaintiff was suffering from an involutional psychotic reaction paranoid type"; and that it was his impression that she was in need of immediate care and treatment. On November 12, 1956, the plaintiff signed a voluntary admission paper. G. L. c. 123, § 86 (as amended through St. 1955, c. 637, § 15).

Dr. William M. Konikov testified that he was a resident physician psychiatrist at Bournewood; that he saw the plaintiff on November 3, 1956; and that in the course of the first few days of her hospitalization he made a diagnosis

that she was suffering from involutional psychosis paranoid type, and was in the need of hospitalization and treatment.

On the testimony of any one of three witnesses, namely, the plaintiff, her husband, and the defendant, a battery occurred, when the attendants took the plaintiff by the arms or "grabbed" her, unless she consented or the action was privileged. *Commonwealth* v. *Clark,* 2 Met. 23, 24. *Commonwealth* v. *Ruggles,* 6 Allen, 588, 590–591. Restatement: Torts, § 13. See *Leonard* v. *West,* 281 Mass. 244. In assault the burden is on the plaintiff to prove lack of consent. *Ford* v. *Ford,* 143 Mass. 577, 578. Restatement: Torts, § 13, comment f. But there is nothing to indicate that on that occasion the plaintiff did consent. Consequently, unless the husband's consent is to be deemed the equivalent of hers, there was no consent.

(a) The defendant relies upon privilege under G. L. c. 123, § 79 (as amended through St. 1941, c. 645, § 2[1]). The first sentence of this section reads, "The superintendent or manager of any institution for the insane may, when requested by a physician . . ., receive and care for in such institution as a patient, for a period not exceeding ten days, any person deemed by such superintendent or manager to be in need of immediate care and treatment because of mental derangement other than drunkenness." The third sentence is, "Such request for admission of a patient shall be put in writing and be filed at the institution at the time of his reception, together with a statement in a form prescribed or approved by the department [of mental health], giving such information as it deems appropriate."

This statute, which originated in St. 1911, c. 395, was before this court in 1935 in *Karjavainen* v. *Buswell,* 289 Mass. 419, where it was said (page 426): "By necessary implication the superintendent and manager who receive patients for examination under the statute are protected by the statute against an action for false imprisonment. . . .

---

[1] An amendment by St. 1956, c. 589, § 5, is of no present materiality.

Belger *v.* Arnot.

[A]ny statute is to be strictly construed which purports to authorize a person or an officer of government to restrain for any length of time a person in the exercise of his personal liberty.  So construed, § 79 requires by necessary implication that a physician, as also every one of the persons or officers named in § 79, shall act in good faith and without negligence whenever, acting under said section, they exercise the power conferred on them by that statute. Section 79 provides with particularity how such commitment shall be made, and plainly indicates that no physician, nor any person or officer named in said statute, should arrest and send to an insane asylum for examination and care a person who is merely insane, but not needing immediate treatment, and not dangerously insane or disturbing the peace.  *Look* v. *Choate,* 108 Mass. 121, 123.''

The trial judge granted the defendant's first and second requests for rulings: ''1.  A physician, who in the manner set forth in G. L. (Ter. Ed.) c. 123, § 79, causes the hospitalization of another, is not liable therefor, if in so doing he acts in good faith and without negligence.  2.  A physician, who in the manner set forth in G. L. (Ter. Ed.) c. 123, § 79, causes the hospitalization of another, is not liable therefor, if the person hospitalized was actually in need of immediate care and treatment because of mental derangement.''

These rulings have become the law of the case, and cover all that was laid down in the *Karjavainen* case which is presently material.[1]  We need not discuss this aspect in detail as the testimony of the defendant and of Drs. Saltzman and Konikov would warrant findings of good faith, lack of negligence, and the need for immediate care and treatment with a reasonable possibility of harm to others. Contrary to the plaintiff's contention, it is not the fact that the only basis for considering the plaintiff to be dangerous is that ten years before she had some communication with God on a bus.  The foregoing analysis is equally applicable

---

[1] No question of disturbing the peace is presented.

to a claim of battery based on the electric shock treatments during the first ten days which reasonably could be found to be embraced within "care and treatment" in § 79.

Accordingly, it was error to deny the defendant's request numbered 16.

(b) Whether the husband's consent constituted another reason why request 16 should have been granted we need not consider. We shall refer to the effect of his consent when we take up the denial of other requests.

(c) The plaintiff's signature to the voluntary admission paper was a consent to all treatment given subsequent to November 12, it not being contended that she was in no condition to sign or that she did so because of any misrepresentation. See *Leggate* v. *Clark,* 111 Mass. 308, 309.

2. Since there must be a new trial, we shall discuss the effect of the husband's consent. The judge denied the defendant's requests numbered 5 and 6. The fifth request was: "The consent of a husband to the care and treatment of an insane wife, is in law the consent of such wife, and a bar to an action of assault and battery by said wife against a physician, based upon said care and treatment." The sixth request was identical except that the wife was described as "mentally deranged" in place of "insane."

The requests are not based on any statutory procedure. They purport to be abstract statements of the common law. We are of opinion that they could not be given in their precise form, but should be qualified by the proviso that there is danger of harm to the wife or to others. This limitation is most reasonable in view of the many procedures established in c. 123 for the commitment of persons to mental hospitals or their admission for care and treatment. See *Mezullo* v. *Maletz,* 331 Mass. 233, 234. See also 1956 Senate Doc. No. 700, "Report of the Special Commission on Commitment, Care and Treatment of Mental Health Hospital Patients." Such a qualification was the view of Chief Justice Shaw who, in 1845 in speaking for the court in *Matter of Oakes,* 8 Law Rep. 122, said (page 124), "The right to restrain an insane person of his liberty, is found in

that great law of humanity, which makes it necessary to confine those whose going at large would be dangerous to themselves or others.'' This case was cited with approval[1] in *Denny* v. *Tyler,* 3 Allen, 225, 229, although in the latter case the element of danger to the patient or to others was not discussed and apparently thought not crucial where a patient ''is capable of exerting no intelligent will or sound discretion in his own behalf'' (page 227). Cf. *Look* v. *Dean,* 108 Mass. 116, 120–121; *Look* v. *Choate,* 108 Mass. 121, 122–123. The plaintiff's argument that the husband could not consent in the absence of an emergency does not give weight to the existence of evidence warranting a finding that the plaintiff might cause harm to herself or others.

While much often turns upon local statutes, we believe that the majority of the cases elsewhere recognize the requirement that there be danger to the patient or others before summary restraint outside any statutory procedure is justified. *Crawford* v. *Brown,* 321 Ill. 305, 316–318. *Maxwell* v. *Maxwell,* 189 Iowa, 7, 12–14. *Boesch* v. *Kick,* 97 N. J. L. 92, 96–97. *Warner* v. *State,* 297 N. Y. 395, 401–403. *Commonwealth ex rel. Baird* v. *Noyes,* 83 D. & C. (Pa.) 311, 314–318. Cf. *Orvis* v. *Brickman,* 196 F. 2d 762, 767 (D. C. Cir.); *Christiansen* v. *Weston,* 36 Ariz. 200. There are cases not expressly mentioning the requirement. *Maben* v. *Rankin,* 55 Cal. 2d 139, 141, 142 (statutes controlling). *Van Deusen* v. *Newcomer,* 40 Mich. 90, 111–113 (cf. opinion of Cooley, J., pp. 128–130). *Davis* v. *Merrill,* 47 N. H. 208 (citing *Oakes* case at p. 210).

*Exceptions sustained.*

---

[1] *Oakes* case also cited in *Dowdell, petitioner,* 169 Mass. 387.