Rubie ROGERS et al., Plaintiffs,
Appellees and Cross–Appellants,

v.

Robert OKIN, M.D. et al., Defendants,
Appellants and Cross–Appellees.

Nos. 79–1648, 79–1649.

United States Court of Appeals,
First Circuit.

Argued May 8, 1980.

Decided Nov. 25, 1980.

Richard W. Cole, Roxbury, Md., with whom Robert Burdick, Clyde D. Bergstresser, Shubow, Stahlin & Bergstresser and Michael Haroz, Boston, Mass., were on brief, for Ruby Rogers, et al.

Stephen Schultz, Administrative and Legal Counsel, Boston, Mass., with whom, Francis X. Bellotti, Atty. Gen., Boston, Mass., was on brief, for Robert Okin, et al.

Joel I. Klein, Washington, D. C., with whom Ellen S. Silberman and Rogovin, Stern & Huge, Washington, D. C., were on brief, for American Psychiatric Association, amicus curiae.

Christopher A. Hansen, New York City, with whom Robert M. Levy, New York City, and Robert Plotkin, Washington, D. C., were on brief, for The American Orthopsychiatric Association, The Mental Health Association, the Civil Liberties Union of Massachusetts, and The Mental Patients' Liberation Front, amici curiae.

Thomas F. O'Hare, Wellesley, Mass., and Susan F. Kendall, Law Student, Boston, Mass., on brief, for The Mental Health Legal Advisors Committee, amicus curiae.

Patrick R. Carroll, Boston, Mass., and William T. McGrail, Clinton, Mass., on brief,

for The Massachusetts Hospital Association, Inc., amicus curiae.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, DAVIS, Judge, U.S. Court of Claims.*

COFFIN, Chief Judge.

These appeals are the latest stage in a lengthy and complex civil rights action concerning the practices at Massachusetts state mental health facilities. Plaintiffs are voluntary and involuntary psychiatric patients at Massachusetts state mental health facilities. Defendants are the state Commissioner of Mental Health and various hospital officials and physicians responsible for plaintiffs' care. The full factual background and procedural history are set forth in the published opinion of the district court, *Rogers v. Okin*, 478 F.Supp. 1342 (D.Mass.1979), and will not be repeated here. Two chief issues are raised in these cross–appeals from the district court judgment: I. Under what circumstances may state officials forcibly administer antipsychotic drugs to mental health patients without violating the Fourteenth Amendment? II. Did the district court correctly find that an award of monetary damages to plaintiffs under 42 U.S.C. § 1983 or various state causes of action was not warranted? On the latter issue, we fully concur with the judgment of the district court. With regard to the former, we are in substantial agreement with portions of the district court's reasoning, but find that several important aspects of the court's ruling require modification.

## I.

### A. *Nature of the Individual Right*

We begin our analysis with what seems to us to be an intuitively obvious proposition: a person has a constitutionally protected interest in being left free by the state to decide for himself whether to submit to the serious and potentially harmful medical treatment that is represented by the administration of antipsychotic drugs.[1] The precise textual source in the Constitution of the protection of this interest is unclear, and the authorities directly supportive of the proposition itself are surprisingly few. Nevertheless, we are convinced that the proposition is correct and that a source in the Due Process Clause of the Fourteenth Amendment for the protection of this interest exists, most likely as part of the penumbral right to privacy, bodily integrity, or personal security. *See Parham v. J. R.*, 442 U.S. 584, 626, 99 S.Ct. 2493, 2516, 61 L.Ed.2d 101 (1979) (Brennan, J., dissenting on other grounds); *Rennie v. Klein*, 462 F.Supp. 1131, 1144–45 (D.N.J. 1978) (on motion for preliminary injunction); *In Re KKB*, 609 P.2d 747 (Okl.1980); *Superintendent of Belchertown v. Saikewicz*, 373 Mass. 728, 370 N.E.2d 417 (1977); *cf. Ingraham v. Wright*, 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977) ("Among the historic liberties [protected by the Due Process Clause] was a right to be free from . . . unjustified intrusions on personal security."); *Breithaupt v. Abram*, 352 U.S. 432, 439, 77 S.Ct. 408, 412, 1 L.Ed.2d 448 (1957) ("right of an individual that his person be held inviolable"). *See generally, Developments in the Law—Civil Commitment of the Mentally Ill*, 87 Harv.L.Rev.

---

* Sitting by designation.

1. We use the term "antipsychotic drugs" to refer to medications such as Thorazine, Mellaril, Prolixis and Haldol that are used in treating psychoses, particularly schizophrenia. The district court used this term interchangeably with the apparently broader term "psychotropic drugs", which may include antidepressants and lithium, and which as far as the record shows do not have as substantial a potential for serious side effects as do the antipsychotics. Both the parties and the district court have throughout this litigation focused exclusively on the antipsychotics, *see, e. g.,* 478 F.Supp. at 1359–60. Accordingly, we interpret the district court's use of the term "psychotropic drugs" to mean antipsychotic drugs. The potentially harmful side effects of these drugs are set forth in detail in the record, and described in part in the district court opinion. Foremost among them is tardive dyskinesia, a painful, disfiguring, and sometimes disabling neurological affliction which all parties in this case concede might be caused by the use of antipsychotic drugs.

1190, 1194–96 (1974) [hereinafter cited as *Developments*].[2]

None of the parties or *amici* in this suit contest the correctness of this general proposition. With regard to the treatment of the mentally ill in state run institutions, however, defendants point to several state interests that, they claim, override the individual's protected interest and justify the forced administration of drugs. Additionally, defendants contend that within this context, the interests of the individuals to whom the state wishes to administer drugs are fundamentally different from those of individuals who are not mentally ill, and are not in fact inconsistent with the interests of the state. Plaintiffs, on the other hand, while conceding that the interests of the individual are not absolute and can be overridden in certain circumstances, argue that the mere fact that an individual suffers from mental illness and resides in a mental health facility does not constitute such a circumstance. In order to resolve this dispute between the parties, we first examine the various state interests involved.

### B. *State Interests*

As we have indicated, neither defendants nor their *amici* argue that the state could forcibly administer antipsychotic drugs to a randomly selected "normal" individual. Unfortunately, the plaintiffs in this suit are far from "normal". Instead, suffering from various mental illnesses, they are in the words of the district court "victims of fate shortchanged by life." 478 F.Supp. at 1369. As a result of their afflictions, they are in many instances in desperate need of care and treatment, and, in some cases, are dangerous to either themselves or others. Because of their illnesses, some of these individuals are unable to make any meaningful choice as to whether they should accept treatment, including the administration of drugs. Given these circumstances, the state asserts primarily its police power and its *parens partiae* power as justifications for the forcible administration of antipsychotic drugs to those individuals who are in state run hospitals as a result of mental illness.

1. *Police Power.* The parties agree that the state has a legitimate interest in protecting persons from physical harm at the hands of the mentally ill. They also agree that this interest can justify the forcible administration of drugs to a mentally ill person whether or not that person has been adjudicated incompetent to make his own treatment decisions. The district court accordingly held that "a committed mental patient may be forcibly medicated in an emergency situation in which a failure to do so would result in a substantial likelihood of physical harm to that patient, other patients, or to staff members of the institution." 478 F.Supp. at 1365.[3] Plaintiffs have no complaint with this ruling. Defendants, however, have two basic complaints, which they raise on this appeal. First, defendants contend that the district court's definition of emergency is too narrow and should include situations in which "a patient requires the prompt initiation of medication to prevent further suffering by that patient or the rapid worsening of that person's clinical state." Since the state interests sought to be furthered by this proffered definition are its *parens patriae* interests—the desire to treat the patient effectively—we shall address that part of defendants' argument in Part I.B.2 of this opinion, *infra*.

Defendants' second basic complaint is that the necessity of finding a "substantial likelihood of physical harm . . ." (*see* note 3, *supra*) is an overly rigid and unworkable

---

2. The district court found that First Amendment rights were also implicated. 478 F.Supp. at 1366–67. *See also Scott v. Plante,* 532 F.2d 939, 946 (3d Cir. 1976); *Winters v. Miller,* 446 F.2d 65 (2d Cir.), *cert. denied,* 404 U.S. 985, 92 S.Ct. 450, 30 L.Ed.2d 369 (1971). We find it unnecessary in the present case to decide if this finding is correct.

3. The exact meaning of the term "substantial likelihood" is unclear on its face. Elsewhere in its opinion, however, the district court suggests that in using this term it means "more likely than not". 478 F.Supp. at 1364. The parties have apparently so construed the term, and so shall we.

requirement. Defendants argue that some mentally ill patients have an identifiable capacity for spontaneous acts of violence but that it is not always possible to determine beforehand whether a specific patient is likely to commit such acts. This problem of prediction is increased, defendants claim, by the prospect that doctors will be second-guessed in section 1983 suits for damages. In sum, defendants assert that the overall effect of following the district court's standard is to increase the incidence of violent acts that otherwise would not occur had a less restrictive standard been used.

The district court rejected this complaint, finding that the actual experience of operating under the standard during the period covered by a temporary restraining order showed defendants' "gloomy forecast" to be "more dramatic than factual". To a certain extent it is clear that throughout this litigation defendants and their supporting *amici* have erroneously attributed acts of violence to the strictness of the court's standard. Nevertheless, it does appear that the district court may have overlooked or misconstrued evidence of specific acts of violence occurring as a result of defendants' difficulty in applying the court's standard.

For example, at one point during the trial, defendant Gill, director of the Austin Unit of the state hospital, testified that a particular patient on one occasion displayed indications of a possible proclivity towards violence. Defendant, who was aware of the patient's previous favorable medical reaction to the administration of drugs, testified that he would have forcibly medicated the patient as a precaution had he been free to do so. He stated, however, that the indications were not sufficiently clear to enable him to predict that the patient would be likely to commit violence without the medication. He therefore did not medicate the patient, who subsequently seriously injured a staff member during a spontaneous violent outburst. The district court dismissed this incident simply by finding that the defendant doctor had erred in his medical prognosis: he should have realized that violence was likely to occur.

This rather typical dialogue reveals, we think, the inaptness in this context of a clear–cut unitary standard of quantitative likelihood that violence would occur if no medication is administered. In the first place, a unitary standard assumes that there is only one kind of probability to be tested: e. g., a likelihood that an individual has committed or is committing a crime, a likelihood that certain contraband will be found on described premises, or a likelihood that A is right and B is wrong. Here, however, there are two sets of interests, each capable of being compelling and, most importantly, each capable of varying from case to case. On the institutional side, we deal with an institution to which many individuals are involuntarily committed because of a demonstrated proclivity for committing acts of violence outside the hospital community, *see* Mass.Gen.Laws Ann. ch. 123 §§ 7, 8 & 1, a proclivity that the record shows often carries over after commitment. The volatility of a large concentration of such individuals adds substance and immediacy to the state's concern in preventing violence. This concern takes on an added dimension when we consider that patients themselves are the likely victims of any violence. These mental patients are persons who, as we have noted, have "a right, under the Fourteenth Amendment, to be secure in [their] life and person while confined under state authority." *Harper v. Cserr*, 544 F.2d 1121, 1123 (1st Cir. 1976), *quoting Spence v. Staras*, 507 F.2d 554, 557 (7th Cir. 1974). On the individual's side, we deal with the concededly substantial right of competent patients to be free from the forcible administration of antipsychotics, the violation of which right may not only occasion temporary distress but possibly aftereffects as well.

The professional judgment–call required in balancing these varying interests and determining whether a patient should be subjected to forcible administering of antipsychotic drugs demands an *individualized* estimation of the possibility and type of violence, the likely effects of particular drugs on a particular individual, and an

appraisal of alternative, less restrictive courses of action. Thus, for example, if the violence feared is potentially life–threatening, and the patient's prior experience with antipsychotics favorable, it would be patently unreasonable to require that defendants determine that the probability of the feared violence occurring is greater than fifty percent before they can act. By contrast, if the patient has experienced severe adverse side–effects from antipsychotics, it would be only reasonable to expect defendants to explore less harmful alternatives much more vigorously than in the former case.

■ Not only do we deem out of place a simplistic unitary standard for police power emergency drug administration, but we see particular problems in adopting such a standard that can be interpreted as requiring a prediction of more–probable–than–not violent behavior. While lawyers and judges may assure themselves that such a standard allows adequate scope for discretion, the important fact is that trained psychiatrists, who possess expert qualifications and experience that the judge lacks, find that in many situations they cannot make predictions that, to their science oriented minds, meet a quantitative level of probability. Instead of second–guessing defendants, the court should have taken as true their asserted difficulties in applying the court's general formulation (at least in the absence of a finding that defendants were lying), and fashioned a ruling that took these difficulties into consideration. "[N]either judges nor administrative hearing officers are better qualified than psychiatrists to render psychiatric judgments." *Parham v. J. R.*, 442 U.S. 584, 607, 99 S.Ct. 2493, 2506, 61 L.Ed.2d 101 (1979), *quoting In re Rogers S.*, 19 Cal. 921, 942, 141 Cal.Rptr. 298, 569 P.2d 1286 (1977) (Clark, J., dissenting). *Cf. Bell v. Wolfish*, 441 U.S. 520, 544, 99 S.Ct. 1861, 1876, 60 L.Ed.2d 447 (1979) (courts should not "second–guess administrators on matters on which they are better informed.").

Moreover, the array of relevant factors bearing on a quantitative judgment in this institutional setting almost defies prediction or reviewability. For example, we suspect that the likelihood of a violence–prone patient's losing control of himself may often depend on the provocation of others. The difficulty of factoring such possibilities into an individual determination makes a preponderance prediction fall short of being practical, not to mention short of being constitutionally mandated.

■ In so holding, we do not imply that the Constitution places no limits on the discretion of the defendants. The state's purpose in administering drugs forcibly must be to further its police power interests, i. e., the decision must be the result of a determination that the need to prevent violence in a particular situation outweighs the possibility of harm to the medicated individual. Thus, medication cannot be forcibly administered solely for treatment purposes absent a finding of incompetency. *See* Part I.B.2 of this opinion, *infra*. Additionally, reasonable alternatives to the administration of antipsychotics must be ruled out. Otherwise, the administration of the drugs would not be necessary to accomplish the state's objective. Indeed, it may be possible that in most situations less restrictive means will be available. On remand, the district court should explore this possibility. Finally, given the interests involved, the Fourteenth Amendment requires the imposition of procedures whereby the necessary determinations can be made with due process. Thus, for example, it would seem that at a minimum the determination that medication is necessary must be made by a qualified physician as to each individual patient to be medicated. What additional procedures might be warranted we leave to the district court on remand, noting only that our admonitions concerning the creation of general, *substantive* standards for weighing the competing interests should not be construed as limiting the ability of the court to be creative in designing procedural mechanisms whereby it can be reasonably sure that the interests of the patients are taken into consideration.

In sum, we hold that the district court should not attempt to fashion a single

"more–likely–than–not" standard as a substitute for an individualized balancing of the varying interests of particular patients in refusing antipsychotic medication against the equally varying interests of patients— and the state–in preventing violence. Because we recognize the legitimacy of both of these interests, we conclude that neither should be allowed necessarily to override the other in a blanket fashion. Instead, the court should leave this difficult, necessarily *ad hoc* balancing to state physicians and limit its own role to designing procedures for ensuring that the patients' interests in refusing antipsychotics are taken into consideration and that antipsychotics are not forcibly administered absent a finding by a qualified physician that those interests are outweighed in a particular situation and less restrictive alternatives are unavailable.

■ 2. *Parens Patriae Powers.* The concept of *parens patriae*, which developed with reference to the power of the sovereign to act as "the general guardian of all infants, idiots, and lunatics", *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 257, 92 S.Ct. 885, 888, 31 L.Ed.2d 184 (1972), *quoting* 3 W. Blackstone, Commentaries *47, is clearly applicable to the facts of this case. There is no doubt that "[t]he state has a legitimate interest under its *parens patriae* powers in providing care to its citizens who are unable to care for themselves . . . ." *Addington v. Texas*, 441 U.S. 418, 426, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979). The use of these powers to go beyond the mere protection of the mentally ill from harm to the forcible administration of treatment thought curative is regarded as having its origins in the Massachusetts case of *In re Oates*, 8 Law Rep. 122 (Mass.1845), *see Developments, supra* at 1209. Such use of the powers is implicit in their very nature.

"Inherent in an adjudication that an individual should be committed under the state's *parens patriae* power is the decision that he can be forced to accept the treatments found to be in his best interest; it would be incongruous if an individual who lacks the capacity to make a treatment decision could frustrate the

very justification for the state's action by refusing such treatments." *Id.* at 1344.

■ In *Oakes* the treatment administered consisted largely of rehabilitative incarceration, which unfortunately was largely ineffective. Today, however, due in large part to the development of numerous drugs for treating mental illness, the possibility of improvement as a result of forced treatment is relatively substantial. Given such a possibility, and confronted with the often severe suffering of individuals afflicted with mental illness, the state today finds its interest in being able to offer meaningful assistance to the individual even more substantial than it was in previous times. However, for the state to invoke this interest as a justification for the administration of treatment that could represent substantial intrusions upon the individual, the individual himself must be incapable of making a competent decision concerning treatment on his own. Otherwise, the very justification for the state's purported exercise of its *parens patriae* power–its citizen's inability to care for himself, *see Addington v. Texas, supra*, 441 U.S. at 426, 99 S.Ct. at 1809– would be missing. Therefore, the *sine qua non* for the state's use of its *parens patriae* power as justification for the forceful administration of mind–affecting drugs is a determination that the individual to whom the drugs are to be administered lacks the capacity to decide for himself whether he should take the drugs. *See Winters v. Miller,* 446 F.2d 65, 71 (2d Cir.), *cert. denied,* 404 U.S. 985, 92 S.Ct. 450, 30 L.Ed.2d 369 (1971).

■ For the most part, the parties do not contest this conclusion. Instead, their dispute concerns whether or not such a determination has in fact been properly made with respect to the plaintiffs. Defendants assert that the judicial commitment proceedings conducted under Massachusetts law, Mass.Gen.Laws Ann. ch. 123 (1979), constitute the determination of incapacity necessary for the state to provide treatment over the objections of the patient. "Given that these patients have already been recognized as so mentally ill that their decision

to reject voluntary hospitalization and its treatment has been overridden, it is illogical to accept the patient's same objections to treatment once hospitalized."[4] To demonstrate why the district court was correct in rejecting this assertion, we turn our focus to the Massachusetts commitment scheme.

The predicate to the prolonged involuntary commitment of an individual under Massachusetts law is a judicial determination that the individual is mentally ill and that failure to hospitalize him would create a "likelihood of serious harm". *Id.* §§ 7, 8. Within the bounds of certain administrative requirements, an individual may be committed without his consent for shorter periods of up to ten days upon a determination by one or more physicians that "failure to hospitalize such person would create a likelihood of serious harm by reason of mental illness." In either situation, "likelihood of serious harm" is defined as:

"(1) a substantial risk of physical harm to the person himself as manifested by evidence of threats of, or attempts at, suicide or serious bodily harm; (2) a substantial risk of physical harm to other persons as manifested by evidence of homicidal or other violent behavior or evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them; or (3) a very substantial risk of physical impairment or injury to the person himself as manifested by evidence that such person's judgment is so affected that he is unable to protect himself in the community and that reasonable provision for his protection is not available in the community." *Id.* § 1.

When we scrutinize this statutory scheme in search of a judicial determination of *incapacity*, we find no direct inference of such. We can conceive of a logical step that could be taken—inferring from an adjudication that an individual was incompetent to make a decision concerning his commitment that he was incompetent to make

decisions concerning his treatment. But even on this basis we see such a nexus only where a finding of "likelihood of serious harm" concerning an individual is based on the third definition of that term in section 1 of the statute. That is, an adjudication that an individual's judgment is so affected that he cannot protect himself in the community may well justify the conclusion that he has also been adjudged incapable of making his own decision concerning his commitment and—to complete the chain of inference—treatment. In such a situation the commitment adjudication may well imply the incapacity to make treatment decisions that justifies the state's assumption of its *parens patriae* role regarding treatment. But adjudications under the first two definitions of section 1 provide no adjudication of judgmental capacity; commitment is based on a determination of risk of physical harm to the individual or to others.

We see no systematic means whereby we might identify those individuals whose commitment is based upon the third statutory definition of "likelihood of serious harm", and appellants point to no such means. It is therefore possible that many or all involuntary patients might have been committed pursuant to the first or second definitions. In short, under the statutory scheme any given individual might have been committed despite the fact that he competently believed that treatment was not in his best interests.

Defendants contest the correctness of this conclusion by pointing to the fact that the statutory scheme does require a finding that the committed individual suffers from mental illness. This finding, defendants argue, is a sufficient predicate to state action based on its *parens patriae* power. Nothing in the statutory scheme, however, suggests that a finding of mental illness is equivalent to a finding that the individual is incapable of deciding for himself whether commitment and treatment are in his own

---

4. Amicus American Psychiatric Association similarly argues that "[t]he fatal flaw in the district court's analysis is its failure to explain why the decision to commit a person against

his will is not a sufficient constitutional predicate to justify the provision of that treatment for which the individual was committed to receive."

best interest. Indeed, as the district court noted, the fact that Massachusetts law provides for a separate proceeding for determinations of legal incompetency, Mass.Gen. Laws Ann. ch. 123 § 25, strongly implies that the commitment proceeding itself is not intended to be a determination that the individual lacks the capacity to make his own treatment decisions. *Cf. Boyd v. Bd. of Registrars of Voters of Belchertown*, 368 Mass. 631, 635–36, 334 N.E.2d 629 (1975) ("profound" distinction between commitment and determination of incompetency). This implication is explicitly confirmed in another section of the statute that recognizes the ability and right of a committed patient to refuse electroconvulsion treatment and lobotomies. Mass.Gen.Laws Ann. ch. 123 § 23. Finally, as a factual matter, the district court found, 478 F.Supp. at 1364, and defendants concede, that not all patients institutionalized for mental illness are incapable of making their own treatment decisions.[5]

The foregoing analysis is not intended to suggest that the Massachusetts commitment scheme is unconstitutional. To the contrary, in many respects the Massachusetts scheme goes well beyond the minimum requirements mandated by the Fourteenth Amendment.[6] The point of our analysis is instead to demonstrate that the commitment decision itself is an inadequate predicate to the forcible administration of drugs to an individual where the purported justification for that action is the state's *parens patriae* power.

In so ruling, we recognize that there is a need for some procedure whereby the state can provide needed treatment to an objecting individual who lacks the capacity to make meaningful treatment decisions on his own. The district court, pointing to the

powers and proceedings of the Massachusetts Probate Courts, Mass.Gen.Laws Ann. ch. 123 § 25; *Superintendent of Belchertown v. Saikewicz, supra,* 373 Mass. at 745–55, 370 N.E.2d 417, found that such a procedure exists in Massachusetts and that it is constitutionally sound. Plaintiffs concurred in this judgment. Defendants, however, contend that the probate proceedings and the use of a guardian are too cumbersome to serve as a necessary predicate to forcible medication for treatment purposes.[7] In so arguing, defendants for the most part misconstrue the import of the district court's reasoning. The court did not hold that fullblown probate proceedings are constitutionally required. Rather, the court held that some determination of incompetency must be made, and found that probate proceedings under section 25 of chapter 123 sufficed. The court specifically advised defendants to aim their complaint concerning the efficacy of these proceedings to the state legislature.

■ We do agree with defendants, however, that there are two aspects of the district court's ruling that require some modification. First, the district court held that absent an "emergency" defendants can never forcibly medicate an individual without an adjudication of incompetency and approval by the appointed guardian. The court defined an emergency as "circumstances in which a failure to [forcibly medicate] would bring about a substantial likelihood of physical harm to the patient or others." In so restricting the definition to instances in which immediate action is required to prevent physical harm the district court rejected defendants' claim that an emergency should also include situations in which the immediate administration of drugs is reasonably believed to be necessary

---

5. It is also worth noting that appellants issue patients an "Admission packet" informing them that they may make their own treatment decisions.

6. For example, the federal Constitution does not mandate a reasonable doubt standard for commitment proceedings, *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), yet Massachusetts employs such a stan-

dard. *Superintendent of Worcester State Hospital v. Hagburg,* 374 Mass. 271, 372 N.E.2d 242 (1978).

7. The district court did find, with ample justifications, that defendants' assertions of impracticality were a bit overblown, noting that "there is statutory authority for 'immediate appointment [of guardians] . . .'" 478 F.Supp. at 1363 n. 15.

to prevent further deterioration in the patient's mental health.

The district court did not proffer any explanation for requiring an actual adjudication of incompetency in such circumstances. While judicial determinations are certainly preferable in general, room must be left for responsible state officials to respond to exigencies that render totally impractical recourse to traditional forms of judicial process.

> "The judicial model of fact finding for all constitutionally protected interests, regardless of their nature, can turn rational decisionmaking into an unmanageable enterprise." *Parham v. J. R.*, 442 U.S. 584, 608 n. 16, 99 S.Ct. 2493, 2507, 61 L.Ed.2d 101 (1979).

Moreover, in the particular situation presented here, it cannot be said that the interests of the patient himself would be furthered by requiring responsible physicians to stand by and watch him slip into possibly chronic illness while awaiting an adjudication of incompetency. *Cf. Coll v. Hyland*, 411 F.Supp. 905, 910 (D.N.J.1976) (three judge court, *per curiam*) ("When the choice is between loss of life or health and a loss of liberty for a brief period of time, the preferable alternative is apparent"). Instead, the interests of the individual in such a situation coincide with those of the state and mandate decisive, immediate action. We therefore vacate the district court's limited definition of the emergency circumstances in which adjudications are not required and remand the case for consideration of alternative means for making incompetency determinations in situations where any delay could result in significant deterioration of the patient's mental health.

■ Second, it is possible to read the district court's opinion as implying that once a determination of incompetency has been made, a traditional, individual guardian must make all treatment decisions involving the use of antipsychotic drugs. To the extent that the district court's opinion might be so read, we reject that part of its holding.

The district court focused extensively on the harmful side effects that the various medications can produce. Its findings concerning these effects are supported by the record. However, the record also shows that in many situations, despite the risks of harmful side effects, the administration of drugs to an individual is clearly in his best interests because of the beneficial effects that the drugs can have, including the amelioration of the patient's illness. In such situations, the *failure* to medicate an incompetent patient could have side effects—e. g., the unnecessary and possibly irreversible continuation of his illness—far more harmful, and probable, than any that might result from the drugs themselves.

Thus, any treatment decision, including the decision not to treat, brings with it the potential for serious harm to the patient. Accordingly, if we were to adopt what is arguably the district court's reasoning concerning guardians, we would be led to the conclusion that appellants must consult a guardian whenever they decide not to administer drugs to an incompetent patient.[8] Such a requirement would, we think, be impractical and largely incapable of enforcement.

Of course the mere fact that it would be impractical to have a guardian make all significant treatment decisions for an incompetent patient does not itself indicate that it is undesirable to have a guardian make those decisions that can be made practically. Our concern, however, is that the requirement of individualized guardian review on only some aspects of significant treatment decisions might in the long run create a tendency for patients to receive other treatment, i. e., no treatment, in situations where the best interests of the patient would dictate otherwise.[9] While we

---

8. At least in the case of individuals declared incompetent and denied the right of acting or choosing on their own, we see no relevant distinction between state action and inaction.

9. This result would occur to the extent that any physicians were deterred, either consciously or unconsciously, from recommending drug treatment due to the need to seek the approval of a guardian. Physicians acting in good faith could

cannot be certain that such a result would occur, we do think that the nature of the problem presented is such that it is unwise to declare that the Constitution requires that state officials must receive guardian approval for individual treatment decisions simply because the administration of drugs is recommended.

■ In so holding, we do not imply that the Constitution places no limits whatsoever on the manner in which the state may decide how to treat incompetent patients. Following a determination of incompetency, state actions based on *parens patriae* interests must be taken with the aim of making treatment decisions as the individual himself would were he competent to do so. *Cf. Superintendent of Belchertown v. Saikewicz, supra,* 373 Mass. at 745–55, 370 N.E.2d 417 ("substituted judgment" standard). Furthermore, in order to ensure compliance with this requirement, some minimum procedural requirements would seem to be necessary. Thus, for example, at a minimum there might be some mechanism for periodic review by nontreating physicians of the full treatment history of patients to ensure that the treating physicians are in fact attempting to make treatment decisions as the patients themselves would were they competent.

■ Appellants claim that they employ such procedures, and ask us to declare them sufficient. We hesitate, however, to make such a finding. Despite our intensive review of this case, our familiarity with the factual details of the functioning of the hospitals and the needs of the patients does not approach that of the district court. Moreover, neither the district court nor the parties have had the opportunity to evaluate the present procedures in terms of the criteria we set forth today. For the purposes of this appeal, we therefore rest on our holding that, absent an emergency, a judicial determination of incapacity to make treatment decisions must be made

before the state may rely on its *parens patriae* powers to forcibly medicate a patient, but, as a constitutional matter, the state is not required to seek individualized guardian approval for decisions to treat incompetent patients with antipsychotic drugs. What procedural safeguards might be required, short of individualized guardian review, we leave for the present to the district court.

## C. *Voluntary Patients*

■ One point that our analysis leaves unaddressed is whether patients who voluntarily enter a state mental health facility have a right to refuse antipsychotic medication. The district court held that "the voluntary patient has the same right to refuse treatment in a non–emergency as does the involuntary patient." 478 F.Supp. at 1368. The court apparently rejected defendants' argument that voluntary patients can be forced to choose between leaving the hospital and accepting prescribed treatment.

In so holding, the district court in effect found that Massachusetts citizens have a constitutional right upon voluntary admittance to state facilities to dictate to the hospital staff the treatment that they are given. The district court cited no authority for this finding, and we know of none. Massachusetts law provides for the voluntary admission of mental health patients who are "in need of care and treatment ... providing the admitting facility is suitable for such care and treatment." Mass.Gen. Laws Ann. ch. 123 § 10(a). The statute does not guarantee voluntary patients the treatment of their choice. Instead, it offers a treatment regimen that state doctors and staff determine is best, and if the patient thinks otherwise, he can leave.[10] We can find nothing even arguably unconstitutional in such a statutory scheme.

nevertheless be so deterred by the need to limit the amount of time spent on administrative matters.

10. To the extent that patients might be prevented from leaving, they become involuntary patients whose rights are as set forth in the preceding parts of this opinion.

## II.

The district court found that plaintiffs Wadsworth, Rogers, Hunt, Bybel, and Colleran were all forcibly medicated prior to issuance of the temporary restraining order in 1975 in situations that did not comply with the district court's definition of an "emergency". The court also found that plaintiffs Wadsworth, Warner, Bolden, Hunt, and Bybel were placed in seclusion during the same time period in situations that did not constitute "emergencies".[11] The court further held that none of these instances warranted an award of damages. Plaintiffs appeal from this last holding, contending that damages were warranted under 42 U.S.C. § 1983 and various state tort laws.

### A. Section 1983

**1. Forcible Medication.** Under *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 995, 1000, 43 L.Ed.2d 214 (1975), defendants can be held liable for damages under section 1983 only if they "acted with such an impermissible motivation or with such disregard of ... clearly established constitutional rights that [their actions] cannot reasonably be characterized as being in good faith." *Id.* The district court's finding that defendants acted in subjective good faith, i. e., did not have "an impermissible motivation" is certainly supported by the record. *See* 478 F.Supp. at 1382. Indeed, one of the few points clearly established by the record is that defendants believed that they were acting legally and in the best interests of plaintiffs.

The court's finding that defendants acted with objective good faith, i. e., not in violation of "clearly established constitutional rights", was also correct. Whatever might be said concerning the extent of plaintiffs' right to refuse medication within the institutional context, that right was certainly not "clearly established" before 1975. *See also* 478 F.Supp. at 1383 n. 58.

**2. Seclusion.** Defendants contend that plaintiffs' constitutional rights were not violated by the seclusion practices employed at the state hospitals, and thus argue that the denial of damages under section 1983 was certainly correct. Because we hold that the district court did not err in finding that the defendants acted in good faith, we need not decide whether plaintiffs' constitutional rights were in fact violated.[12]

As with the medication issue, there is nothing to suggest that the district court clearly erred in finding that the defendants acted in subjective good faith. Nor did the court err in finding objective good faith. Plaintiffs cannot point to a single precedent holding that civilly committed mental health patients have a substantive constitutional right not to be placed in seclusion except in emergencies as defined by the district court. They instead argue that the Massachusetts statute, Mass.Gen.Laws Ann. ch. 123 § 21, and the defendants' own regulations clearly established that plaintiffs had a state–created liberty interest in being free from nonemergency seclusion. From this assertion, plaintiffs reason that defendants should have known that they were violating plaintiffs' constitutional right not to be deprived of a state–created liberty interest without due process.

The Massachusetts statute, however, is not as clear on its face as plaintiffs claim. The statute states that restraint "may be used only in cases of emergency *such as* the occurrence of, or serious threat of, extreme violence, personal injury, or attempted suicide ...." *Id.* (emphasis added). It is thus not clear that the definition of emergency set forth is exclusive, nor is it clear that the term "personal injury" encompasses only physical, as opposed to mental, injury. More importantly, the statute does not explicitly prohibit the use of seclusion for therapeutic purposes, and therefore, given the difficulty and complexity of the task defendants faced, it may not have been unreasonable to regard this portion of

---

11. The court further found that plaintiff Hunt was secluded largely for therapeutic reasons.

12. Defendants have not appealed from the actual substantive ruling that the seclusion practices were unconstitutional.

the statute as totally inapplicable to efforts aimed at curing patients. Finally, not every violation of a state law or agency regulation constitutes a denial of a constitutionally protected liberty or property interest, *see Haines v. Kerner*, 492 F.2d 937, 941 n. 8 (7th Cir. 1974). Even if such an interest were clearly implicated in this case, it is far from clear that the procedures employed in taking it away were insufficient. *Cf. Parham v. J. R.*, 442 U.S. 584, 608–609, 99 S.Ct. 2493, 2507, 61 L.Ed.2d 101 (1979) (due process required, but satisfied by decision by staff physician). In sum, we simply cannot see how the district court erred in finding that defendants did not "[ignore] or disregard ... settled, indisputable law ...." *Wood v. Strickland*, 420 U.S. 308, 321–22, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975).

## B. *State Law Claims*

 Plaintiffs also attempted to recover damages under various state intentional tort theories including false imprisonment and assault and battery.[13] The district court rejected the application of these theories to the facts of this case, finding that under Massachusetts law, the actions of doctors in state mental health facilities are to be judged by the principles of malpractice law as long as the doctors act in good faith. The court found that defendants acted in good faith and in accordance with accepted medical practices. Plaintiffs contend that the district court erred in so refusing to find defendants liable under the intentional tort theories. We disagree.

In the case of *Belger v. Arnot*, 344 Mass. 679, 183 N.E.2d 866 (1972), on which the district court relied, the Massachusetts Supreme Judicial Court noted that the statutory scheme providing for the commitment of mentally ill individuals necessarily implied that hospital officials instrumental in the procuring of a commitment are immune from actions for false imprisonment if they acted in good faith and nonnegligently. *Id.* at 684–85, 183 N.E.2d 866. *See also Karja-*

*vaninen v. Bushwell*, 289 Mass. 419, 426, 194 N.E. 295 (1935). The very same statutory scheme also provides for the treatment of individuals who are committed, Mass.Gen. Laws Ann. ch. 123 § 2, and Massachusetts courts have indicated that treatment can– and should–be administered forcibly in certain situations, *Nason v. Superintendent of Bridgewater State Hospital*, 353 Mass. 604, 608 & 610 n. 7, 233 N.E.2d 908 (1968). It therefore seems apparent to us, as it did to the district court, that Massachusetts courts would hold that defendants are immune from intentional tort actions arising from treatment decisions as long as they acted in good faith and nonnegligently.

The district court's finding that defendants did not act negligently is adequately supported by the record as discussed in the court's opinion. Plaintiffs argue, however, that the record does not support a finding of good faith. Largely for the reasons set forth in the section of this opinion concerning plaintiffs' federal claims, Part II.A., *supra*, we reject this argument. With regard to the particular application of state law, we repeat only the point that it cannot be said that in acting as they did defendants clearly exceeded their authority under the Massachusetts statute. The statutory scheme itself contains no indication that the forcible administration of antipsychotics was prohibited. While it does place limitations on the use of restraints, the limitations are ambiguous, *see* Part II.A.2. of this opinion, *supra*, and it was not unreasonable for defendants to regard them as inapplicable to actions taken for therapeutic purposes. *Cf. Nason v. Superintendent of Bridgewater State Hospital*, 353 Mass. 604, 614, 233 N.E.2d 908 (1968) ("appropriate treatment is to be determined by competent doctors in their best judgment within the limits of permissible medical practice ...").

\* \* \* \* \* \*

In conclusion, we find it worth noting that in an important respect this case differs from the traditional, adversary model

---

**13.** Plaintiffs also raised intentional infliction of emotional distress and invasion of privacy claims, both of which they briefly mention in their brief on appeal. We find that our reasoning regarding the false imprisonment and as-

sault and battery claims are equally applicable to these two wanly proffered claims, and therefore affirm the district court decision concerning them as well.

of private litigation. Plaintiffs and defendants, as well as the various *amici*, share in large part the primary goal of assuring that adequate care and treatment are provided to patients in state hospitals. As is evident from this opinion, we have not accepted absolutist positions advanced by either the parties or *amici*. Accepting the premise that application of the Constitution to the setting of a state mental health institution requires the most sensitive combination of deference to professional judgment and respect for competent individual judgment as to personal autonomy, we have demonstrated our conviction that such a balance is most likely to be achieved through a variety of procedural devices designed for their suitability to this kind of institutional life rather than for their similarity to judicial models. The record of exploration and evaluation of such safeguards has yet to be made. And the making of a record that will advance the interests of all concerned demands that the parties, despite their differences in views, work together on remand in a less absolutist and more pragmatic way to develop constitutionally valid, mutually acceptable, and workable solutions to the difficult issues remaining in this case.

*Judgment affirmed in part, reversed in part, and vacated and remanded for further proceedings in accordance with this opinion.*